STEWART *vs.* THE LANIER HOUSE COMPANY.

[This case was argued at the last term and the decision reserved.]

1. Where the owner of a hotel leased it for a term of years, and covenanted to keep it in tenantable condition during the term, and bound the lessee not to make changes or alterations in the building or premises without the lessor's consent, and the contract inhibited him from making repairs at the lessor's expense without first obtaining its consent, but he was bound to "keep the hotel open and in good, first-rate style," if the lessor failed to keep its covenant to repair, and the building and premises fell into a ruinous condition, and a large portion of the building was suffered to become unfit for comfortable occupancy, the lessee could recoup,

. against suits for the rent, such damages as were traceable solely to a breach of the contract, such as profits which would be its immediate fruits and were independent of any collateral enterprise entered into in contemplation of the same; or, under these limitations, he might recover them, although remote or consequential, provided they were capable of exact computation.

(a.) Damages which are the legal and natural result of the act done though to some extent contingent, are not too remote to be recovered, especially where they are such as may be fairly and reasonably considered as arising either naturally from a breach of the contract itself, or as may reasonably be supposed to have been in contemplation of both the parties at the time they entered into the contract as the probable result of a breach of it.

(b.) The charge of the court does not appear to have been intended to contravene these rules, but they are not distinctly set forth and appositely applied to the circumstances in proof, unmixed with matters somewhat irrelevant and calculated perhaps to confuse, if not to mislead, the jury.

2. While the loss of a contract by which the lessee sub-let the hotel does not enter properly into the measure of damages resulting from a breach of the contract between the lessor and lessee, it being a collateral undertaking which the parties cannot be presumed to have contemplated when they made the contract, yet the matter should have been entirely withdrawn from the consideration of the jury, and they should not have been charged upon the subject, as set out in the nineteenth ground of the motion for new trial. Such a charge could not assist, and might have misled, the jury; especially does this appear, as the verdict for the plaintiff exceeded the amount claimed and a portion of it was written off before it was reduced by the amount of damages allowed to the defendant.

3. It would have been better to have omitted from the charge all allusion to the several remedies open to the lessee for a violation of the covenant to keep in repair, and to have confined the instruction to the issue formed by the defence set up in the pleadings. With others, which might have been taken, the jury had nothing to do, although the propositions laid down may have been abstractly correct.

4. Where, during a portion of the term, the hotel was occupied by sub-tenants of the lessee, it was admissible, with a view to showing the condition of the premises at that time, to prove that applications were made for rooms, and, after inspecting them, the parties desiring to become occupants rejected them because they were out of repair. So also of testimony going to show the reputation of the house with the traveling public and the refusal of parties to patronize or stop at the hotel because it was not in a tenantable condition. So, likewise, of proof offered to show that a man, taking

charge of the hotel in the condition in which it was, and having everything to furnish and the labor to employ, could not run it profitably.

(*a.*) In order to ascertain the cause of the complaints made by guests, it was admissible to show what they said while at the house, or after leaving it.

5. While the opinion of witnesses, although experts as to the amount of the lessee's losses, without the facts on which such opinions are founded, will not serve as a basis of recovery, yet, on the other hand, to restrict the rule to an exact computation of the profits which the lessee has lost by reason of a breach of covenant, would, in a large measure, deprive him of an effective remedy to secure his rights. The lessee cannot be expected to hunt up every person who left the hotel or was deterred from coming to it on account of the uncomfortable condition of the building and rooms, resulting from the want of necessary repairs to render them comfortable and habitable. He can only show generally these and other facts which will enable the jury to approximate his losses. February 17, 1886.

Leases. Claims. Damages. Charge of Court. Evidence. Witness. Before Judge SIMMONS. Bibb Superior Court. October Term, 1884.

The Lanier House Company sued out three distress warrants and brought an action of complaint against J. S. Stewart, based on rent notes, amounting in all to thirty-nine hundred dollars, for rent of the Lanier House, a hotel situated in the city of Macon.

To these distress warrants Stewart filed his counter-affidavit, denying that there was any rent due by him, but alleging that the Lanier House Company was indebted to him in the sum of fifteen thousand dollars, and asking judgment for the same. He alleged that said company had rented the hotel to him for a term of years under a lease binding them to keep the hotel in a tenantable condition, and that they failed to do so, thereby damaging him in the above sum. By agreement, the several suits were consolidated and tried as one case.

On the trial, the plaintiff introduced the distress warrants and levy, and it was admitted that the rents in suit amounted to $3,900.00.

The defendant introduced the following testimony

The lease between the plaintiff and defendant, containing the following clause :

" And the said J. S. Stewart further covenants to keep said hotel open and in good, first-rate style during the said term of lease, and at the end of said term of lease, to surrender the same in as good condition as the same now is, wear and tear excepted. In case of destruction by fire, this lease is to terminate and the said notes remain [ing] and thereafter to become due shall be void. Said Lanier House Company agrees to keep said hotel in a tenantable condition, and no charges [changes] or alterations are to be made in or concerning said hotel building or premises without the consent of said Lanier House Company, and no repairs are to be charged to said Lanier House Company without the consent of said Lanier House Company obtained before such repairs are made."

*G. W. Byington :* Is a hotel-keeper by occupation. He and Rushing rented the Lanier House from Stewart with the consent of the company ; " the contract binding them to him also existed between us and the Lanier House Company;" they agreed to do the same for the new firm as for Stewart; they agreed to meet them half way in making improvements—putting in an elevator, steam-heater, etc. The rent agreed to be paid Stewart was $300 per month and ten per cent on the value of his furniture (amounting to $58.38 per month) and to board his family, which was worth $2,500 per annum. The board and $58.38 per month were for the use of the furniture, which was worth about $6,000, but the contract for the house and furniture was made altogether, and was not separated into distinct parts. This was to continue for forty-eight months. The house was in bad repair; rooms on fourth floor were untenantable, and only a portion of those on lower floors ; plastering was cracked and some fallen off; walls were damp and dingy; windows out of repair and roof leaked ; grates and mantels were wanting ; back steps rotten and kitchen floor in bad condition; gas-pipes leaking and water-closets out of repair, causing offensive odors; this was on the way to the dining-room, and caused complaints, and some of the guests left and did not return

on that account. [The witness then detailed at length the condition of the various rooms by numbers.] Had applications for rooms on fourth floor; parties said they would not put their furniture in the rooms because they were leaking and unfit to live in. Five front rooms on fourth floor, if in tenantable condition, could have been rented for $60 per month; another valued at $30; rear rooms, with two in a room, would have rented for $27 per month. Called attention of Stewart and the company to condition of house. Was compelled to give up lease because of condition of rooms. Could have done a much larger business if rooms had been in good condition, and could have carried out contract; turned away a great deal of custom for want of rooms; persons applied for regular board, looked at rooms and would not take them; there were not tenantable rooms enough to pay expenses of running hotel. If in good condition, the location of the hotel is very good. Hotel-keeping is not always a money-making business, even under best conditions. There are a number of things involved in making it a success: there must be custom and hotel accommodations; it must be well attended to and kept,—good meals, good beds, good attention, etc.; and even with all these things, witness never knew a hotel that gave satisfaction to all its guests. A guest cannot be counted on to stay at a hotel any given length of time, unless he has a contract to do so. A run of custom would be necessary to make money. Some losses occur from parties failing to pay. In order to realize $60.00 per month from the rooms mentioned, the occupants would have to have table-board and all the other accommodations of any other guest in order to retain them. In the rooms where mantel-pieces and grates were wanting, it did not appear that there ever had been any. Rushing, the partner of witness, failed shortly before the lease was given up, and this had some little to do with their giving up the house, but they could have continued in spite of the failure. They paid three months rent. The contract

between the company and Stewart was not regularly trans-
ferred, but was left to stand. Rushing proposed to the
company to put in an elevator at a cost of $2,000.00, which
it refused. At the time Rushing failed, witness attempted
to make articles of partnership with Stewart, in order to
continue business with him, but abandoned this because
there were not enough rooms to pay. If in good repair,
the house would be worth $5,000.00 per annum, with privi-
lege of sub-renting.

*Frank A. Hervey :* Is a hotel-keeper; has been in
charge of several hotels; was engaged in the management
of the Lanier House. It was out of repair. [The witness
detailed the several points at which the house was out of
repair.] The walls had an uninviting look—not such as
to attract guests. There were only about seven rooms
(including the parlor) in tenantable condition on the sec-
ond floor, seven or eight on the third floor, and none on
the fourth floor, except one, which had been put in special
repair, not by the company. Had applications for board
from persons who refused to come to the house on account
of the rooms. Doesn't think they stated that fact posi-
tively to him, but there was a broad presumption to that
effect, as they were anxious to come, but would look at the
rooms and would not like them. Witness thinks the loca-
tion for a hotel is good, and if in proper condition, he
would like to have got the management of it. If in good
repair, the house would be worth about $5,500 to $6,000
a year, with all the privileges; $3,000 would not be enough.
There are always complaints in the best regulated hotels,
and there were in this about other things than rooms,
about bells, table and waiting. There are many causes of
dissatisfaction and grumbling in a hotel, and guests leave
hotels for other reasons than on account of rooms. Some-
times the witness believes the reason assigned for leaving
a hotel; sometimes not. Witness names two persons who
looked at rooms in house and did not take them, and a
third who did not take room at the time, but did so sub-

sequently when some changes were made and she got a room to suit her. There were others—a man, his wife and child, and also a man and wife—who made application for board and were shown the rooms. Witness does not think the house could be put in first-class condition without rebuilding. If so put, it would be worth $10,000 a year. Stewart had in his contract of rent from the company the bar, barber-shop and cigar-stand, and these privileges were rented out by him. .

*A. R. Woodson :* Is head-clerk and cashier at the Lanier House. Details leaks, cracks, etc. Carpets were injured by leaks to the extent of about $300 or $400. The company was notified of the want of repair. Complaints were made by guests of the offensive and musty odors, and threats made to leave unless they were stopped. Parties have applied for board and been turned off on account of rooms, probably nearly fifty; others had been put in rooms and have left, probably two or three dozen. At one time, a party of twenty or thirty left after having been in the rooms. Complaints were numerous. Persons who had been guests had, on a number of occasions, re- fused to return. Nearly $200 had been expended by Stew- art and Byington in making repairs at different times. The company had some leaks stopped, but recently have not done so, and declined to pay the bill for the last repairs. Witness thinks they assigned want of money as the reason. Cigar stand, barber-shop and billiard-room were rented by Stewart for an aggregate rental of $180 per month. Stewart & Powell had the house as a firm for a few months, and afterwards Stewart took it. He was there as proprietor, but witness did not think he looked over the house until he took it. Complaints were sometimes made of other matters than the rooms—of the table, service, bells, etc. It is always so in a hotel. Have had some to leave be- cause they were not waited on as quickly as they wished, or did not get what they wanted. The general dissatis- faction was on account of the rooms. On account of leak-

ing, a fire had to be furnished a book-agent to dry off the carpet. It cost about $5; was in the winter. Byington & Rushing assigned, as a reason for quitting, that the contract had not been complied with and they could not make any money; in fact, their patronage had increased, and witness advised Byington not to quit, as he was then in a position to make money out of the hotel. Stewart & Byington started business together, but continued only for a short while. If in tenantable condition, the hotel would be worth about $3,000 more a year.

*J. S. Stewart (defendant):* In June, 1881, witness and Powell leased the hotel and went into possession. Subsequently Powell retired, and the lease was re-made by the company to defendant on the same terms. In September, 1882, defendant rented the hotel and all its appurtenances to Byington & Rushing. The company agreed to this, and that they would do the same for Byington & Rushing as for Stewart; and as a further inducement for the new firm to make the contract, the company promised to put the house in better repair. They did repair the office and dining-room and probably the reading-room, but did not make other necessary repairs, though both Byington and defendant called on them to do so. The secretary and treasurer finally declined to confer with Byington. The company authorized the stoppage of some leaks by defendant and putting it in the bill against them. Defendant paid the rent regularly and did not apply it to repairs; had he done so, it would not have been sufficient to put the house in good condition. The company did not authorize this to be done. It would have taken fiom five to ten thousand dollars to have put the hotel in good repair. If put in merely a tenantable condition, the house alone would be worth at least $4,000 a year; in its present condition, it would have to be run at a loss. Under his contract with Byington & Rushing, he was to get $358 per month and board for his family of ten (estimated at about $250) for the use of the hotel, fixtures, furniture, bar-room,

billiard-tables, cigar-stand and barber-shop. The $58 was arrived at as a per cent on the furniture. It damages furniture twenty-five or thirty per cent to use it a year. ·Defendant, on the faith of the lease, bought the furniture from a former owner for $7,500, and added more, making about ten thousand dollars' worth. His contract with the company was $300 per month. In November, Byington & Rushing notified him that they would not pay any more rent until the house was put in repair. After this notice, Rushing failed. Byington & Rushing did not pay rent further, and gave up the house, having paid three months' rent and been in possession four months. [Witness detailed the various items of want of repair.] Persons frequently would not occupy the rooms to which they had been assigned and would make complaints. Fifty or more rooms are not tenantable. Defendant has been compelled to expend at least $300 for repairs. The company made some slight repairs, and some repairs were done which were taken out of the bills, but the general repairs were not touched. One reason assigned by the company for not making repairs was want of money to do so.

*Charles Dreyfus :* Testifies to leaks and that a number of rooms could not be used. Has heard some complaints of other matters, but mostly of rooms. Hotel is kept as a first-class hotel, except as to rooms. Knows of one dramatic company of twenty-five people who engaged board and then would not remain on account of rooms. This was shortly after defendant took house back. Also testifies to bad condition of water-closet. Keeps cigar-stand in hotel; considers his business affected about two-thirds by condition of affairs. Had paid $40 per month rent; now pays $35, and has notified defendant that he will not pay rent any further.

*J. S. Key:* Boarded at Lanier House. Attention and fare were satisfactory, but room bad, though considered one of the best.

Other testimony to show the bad repair of the building was introduced, but it need not be set out in detail.

The plaintiff introduced the following testimony in rebuttal:

*Wm. B. Johnston:* Is president of the company, it being a stock company. In the summer of 1879, the house was put in good condition, except rooms on fourth floor, which were not wanted; of these, three were prepared for use. Electric bells were put in and gas-pipes tested and repaired, and water-closets put in good condition. In June, 1881, the house was leased at $3,600 per annum to defendant. It was in good condition, except rooms on fourth floor, which were in the same condition when the lease was made as afterwards. If in first-class condition, the rental value of the house would be five or six thousand dollars a year. In its present state, witness thinks it worth $3,000 a year. At the time Byington & Rushing went in, no changes were made, except that, from time to time, ordinary and necessary repairs were made, and this never was refused until defendant ceased to pay rent. The company had no income except from rents, and after they were not paid, witness so stated to the defendant, and that repairs could not be made for want of money. Thinks there were some repairs made, which it was agreed should come out of rents. There never was any independent contract between the company and Byington & Rushing, nor any inducement held out to them; the company did not accept them as tenants, but merely did not object to defendant's re-renting to them. There was no agreement to put in an elevator and heater and divide the expense. Byington & Rushing proposed that, if the company would put in an elevator and heater, and put all the house in repair, at an estimated cost of $6,000, they would rent it at $6,000 per year, with the consent of the defendant, which they seemed to have. Witness responded that, if the firm would expend the $6,000 in repairs, the company would allow it to them in rent, but the proposition never was closed.

The gas-fixtures belonged to the tenants, and not to the company, and the latter had nothing to do with leakage in them. The rooms complained of as not having mantels and grates never had them, and were not intended to have them, but were intended for wood-fires. The back staircase, testified to be out of repair, led to the place where the water-closet formerly stood, and since its removal there was no use for the stairs, and they were abandoned. Does think roof leaked at time of renting to Stewart & Powell; it was partly renewed in 1881. Witness went through house and examined it when Stewart agreed to take it; has been in the house, but not entirely through it, since.

*L. Ripley :* This witness testified substantially the same as witness Johnston, as to condition of building when defendant leased, and also as follows : Was secretary and treasurer of the company; always tried to have small matters of repairs attended to as soon as possible ; matters of importance were submitted to the president. Witness refreshed his memory from a book and testified to a considerable number of items of expenditures for repairs. Bying ton & Rushing desired certain things to be done, and as the company had agreed to do as much, under the contract, for them as for Stewart, witness stated to Byington that he had a certain amount of money on hand, and Byington told him to expend it on the office and dining-room and on that floor ; that the upper rooms "will do for the present," and this was accordingly done. Was present when water-closet was cleaned out on one occasion; it was choked up with crockery and rubbish which had been thrown into it. Repairs mentioned as needed in counter-affidavit of defendant have not been done.

Other testimony corroborative of the statement as to the repairs done in 1879, and smaller repairs since, was introduced, but it need not be set out in full.

The jury found for the plaintiff $4,200.00, with $1,000.00 to be deducted therefrom as damages, and plaintiff to pay costs.

The defendant moved for a new trial, on the following grounds:

(1) to (3.) Because the verdict was contrary to law, evidence and the charge of the court.

(4.) Because the court refused to permit the defendant to prove that, while Byington & Rushing were running the hotel, under their contract with defendant, applications for rooms therein were made, and the parties, after looking at them, refused to take them, because they were somewhat out of repair.

(5.) Because the court ruled out the following testimony of the witness, Hervey: " The general condition of part of the house was such that it had a tendency to create neuralgia, especially on my part: I suffered from neuralgia."

(6.) Because the court ruled out the following testimony of the same witness: " I know the general reputation of the house is very bad with the traveling public."

(7.) Because the court refused to permit the same witness to answer the question, whether he knew of persons who refused to go to the hotel because it was not in a tenantable condition.

(8.) Because the court refused to allow the same witness (who had stated his experience in running hotels) to answer the question, whether a man, taking charge of this hotel in its present condition, and having everything to furnish and all the labor to employ, could run it at a profit.

(9.) Because the court refused to allow the same witness to answer the following question: " What reasonable profits could have been made out of this hotel. if it had been in a tenantable condition ?"

(10.) Because the court refused to allow the witness, Woodson, after testifying about the complaints made by guests as to the condition of the rooms, to further testify that, when he met these same persons on the street after

leaving the hotel, they gave, as their reason for not return-
ing, the bad condition of the rooms.

(11.) Because the court refused to allow the same wit-
ness to answer the question, whether this hotel could be
carried on with any profits.

(12.) Because the court refused to allow the defendant
to answer the question, what profits could be made out of
the Lanier House by an ordinary hotel-keeper if it was
in a tenantable condition?

(13.) Because the court refused to permit the defend-
ant to testify that he had made no profits out of the Lanier
House because of its untenantable condition, having pre-
viously testified as to the condition of the hotel.

(14.) Because the court refused to rule out the follow-
ing testimony of the witness, Ripley: "I had a certain
amount of money that I thought could be spent judiciously,
and I stated that amount to Mr. Byington; he told me at
the time, 'I want you to put that money upon the office
and upon the dining-room and down on this floor; the
upper rooms will do for the present.'"—Objection: "This
was error, as the court would not permit the jury to
consider the renting to Byington in estimating the dam-
ages sustained by defendant."

(15.) Because the verdict is contrary to the evidence
in this, the rent notes introduced in evidence call for or
amount to only $3,900.00, and the jury found $4,200.00
for the plaintiff. [Before the hearing of the motion, plain-
tiff's attorneys voluntarily wrote off $300.00 from the ver-
dict and judgment.]

(16.) Because the court charged that the failure of the
plaintiff to make the repairs did not release the defendant
from paying the rent.

(17.) Because the court charged as follows: "If the
Lanier House Company failed to comply with their part
of the contract, Mr. Stewart has two or three remedies.
He can resort to the remedy which he has resorted to,
by saying that there is no rent due, because they have failed

to do that, and plead that in diminution of the rent—plead his damages to reduce the rent of the Lanier House; or he can make the repairs himself and charge it to the Lanier House Company; or, if the house has become untenantable for the use he rents it for, he then can plead that to these notes. If the house got into such a condition that it was not suitable for the use Mr. Stewart rents it for, then, in law, it amounts to an eviction; or, in other words, turns him out, and he can plead that and recoup in damages whatever damages he has shown. Now, keep that in mind all the way through in your investigation of this case." —The objection to this charge is, that the jury could not understand it; it is confusing and contradictory, and does not lay down a clear rule by which they are to determine the damages in the event they find the Lanier House untenantable.

(18.) Because the court, after giving the charge just set out, refused, on request of defendant's counsel, who insisted that the jury did not understand it, to re-state the propositions.

(19.) Because the court charged as follows: "It is claimed by Mr. Stewart that he sub-let this house, and the privileges of the bar, cigar-stand and things of that sort, to Messrs. Byington & Rushing at a profit, and that his lease had so many years to run, and that he lost that profit by reason of the failure of the Lanier House Company to make repairs. I have studied about that question a good deal since this case has been going on, and the conclusion I have come to about it is that Mr. Stewart is not entitled to recover for any loss he may have sustained by his contract with Messrs. Byington & Rushing; that, under the Code, would not be the immediate fruits of his contract; it would be an independent collateral enterprise which he entered into; and therefore he could not charge the Lanier House Company with any loss he sustained by sub-letting the house to Byington & Rushing, although they may have quit because the company failed to make the necessary

repairs; and if there is any such evidence of it in this case, you will eliminate all those damages from this case."—Objected to because the court had admitted all the evidence on this point and had given no notice that it would be ruled out until it was in the charge; and it prevented the defendant from recovering, and the jury from considering, any damage sustained by defendant while Byington & Rushing were in possession.

(20.) Because the court charged as follows: "Now, eliminating that element of damage in this case, the jury will look to see what other damage Mr. Stewart has sustained and proved to the satisfaction of the jury. Now, in order to get at the elements of damages in this case, the jury will look to see what are the damages Mr. Stewart has sustained and proved to the satisfaction of the jury. I allowed him to prove the loss of certain patronage, and if any value has been put to that by the evidence, the jury can take that into consideration. For instance, if certain people went there and certain people applied there for board, and refused to receive those rooms by reason of the fact that they were in bad repair, I allowed that to go to the jury. But Mr. Stewart must have gone further and shown how much he has lost by that, and if he has done so to your satisfaction, you will be authorized to consider that as damages. If he has not fixed any value on it, then of course the jury cannot consider it. I believe that these are about the only principles of law that I see proper to give you in charge."—Objected to as error under all the evidence, and because it contains a strong intimation that defendant had failed by his proof to show that the patronage he lost had any value.

(21.) Because the court, after charging about damage to carpets, furniture, etc., and withdrawing the evidence about Byington & Rushing, and charging as just set forth, limited the jury to these elements of damage and failed to charge them upon the other elements insisted on by the defendant. [The court, in certifying, refers to the brief of evidence and charge.]

(22.) Because the charge, as a whole, did not present the defendant's side of the case to the jury; it confined the consideration of the jury to certain elements of dam-ages, and practically excluded others, and was calculated to confuse the jury on the principle found in the case, to-wit, as to the measure of damages, if they found the Lanier House in an untenantable condition. [The court, in certifying, refers to the brief of evidence and the charge.]

The motion was overruled, and the defendant excepted.

BACON & RUTHERFORD, for plaintiff in error, cited Code, §§3073, 2944; 9 Exch., 341, 354; 49 N. H., 45; 6 Am. R., 460; 16 N. Y., 489; 63 *Id.*, 561; 7 Cush., 516; 57 *Ga.*, 128; 33 Barb., 401, 404 *et seq.*; 33 Iowa, 424, 501; 18 C. B. (N. S.), 443; 20 L. & Eq. Rep., 41; 60 *Ga.*, 148; 68 *Id.*, 780; 22 *Id.*, 269; 26 *Id.*, 125; 56 *Id.*, 188; 67 *Id.*, 534, 540; 17 Ala., 689; 6 Bing. (N. C.), 212; 11 Mich., 542; 96 E. C. L. (E. B. & E.), 84; 20 Wis., 412; 71 N. Y., 118; 34 *Id.*, 634; 36 N. J., 261; 30 *Ga.*, 560, 576; 25 *Id.*, 386; 19 *Id.*, 420; 117 Mass., 262 (19 Am. R., 415); 1 Saund., 204; 7 C. B., 266, 283; 17 *Id.*, 30; 1 Allen, 489; 1 Ventris, 276, 277; 64 Ill., 416; 39 N. Y., 53.

WASHINGTON DESSAU; GEO. W. GUSTIN, for defendant, cited Code, §2944; 22 *Ga.*, 269; 23 *Id.*, 17; 19 *Id.*, 417; 41 *Id.*, 71; 68 *Id.*, 780; 16 N. Y., 489; 7 Hill (N. Y.), 60, 67, 68; 91 E. C. L. R., 139; 74 *Ga.*, 233; 71 *Id.*, 518; Wood's Mayne Dam., 50; 58 *Ga.*, 180; 42 Penn. St., 438; 1 Sedg. Meas. Dam., 126 and cit., 166; 39 Md., 510; 3 Suth. Dam., 146, 160, 167; 7 Cush., 516; 42 Am. Dec., 38, note; 1 Suth. Dam., 74, 84, 106; L R. 8 C. P., 136; 79 Penn. St.; 7 Heisk., 167; 1 Md., 329.

HALL, Justice.

The plaintiff, by its lease, covenanted to keep the hotel in tenantable condition during the term for which the de-fendant leased it, and bound him not to make changes or

alterations in the building or premises without its consent, inhibiting him even from making repairs at its expense without obtaining its consent before the same were made. There is little doubt that, by a failure to keep this covenant, the building and premises fell into a ruinous condition, and a large portion of it was suffered to become unfit for comfortable occupancy. To suits for the rent, defendant pleaded his losses from this cause in bar of a recovery, and insisted that his damages greatly exceeded the amount of rent in arrear, and claimed a verdict for the excess.    He now contends that the court restricted the inquiry of the jury upon this subject to limits too narrow, and in pursuance of this restriction, rejected evidence which should have been received for the purpose of showing the extent of the damage he suffered in consequence of the failure of the plaintiff to keep the premises in repair ; and these are the material questions made by this record

1. There can be little doubt that he was entitled to recoup such damages as are traceable solely to a breach of the contract, such as profits which would be its immediate fruits and are independent of any collateral enterprise entered into in contemplation of the same, or under these limitations, that he might recover them, although remote or consequential, provided they were capable of exact computation. Code, §2944. Damages which are the legal and natural result of the act done, though to some extent contingent, are not too remote to be recovered. *Id.*, §3073. Especially is this true, where they are such as may be fairly and reasonably considered as arising either naturally, *i. e.*, according to the usual course of things, from a breach of the contract itself, or may reasonably be supposed to have been in contemplation of both the parties at the time they entered into the contract, as the probable result of a breach of it    Hadley *vs.* Baxendale, 9 Exch. R., 341, 354, which is the leading case upon this question, and from which the above cited sections of our Code were probably taken ; *Georgia R. R. vs. Hayden*, 71 *Ga.*, 518, 522, and citations there, together with others cited on the briefs of

counsel, which will appear at the end of the reporter's statement.

The natural inference would be, that it was in contemplation of both parties when this contract was executed, that if the plaintiff broke its covenant and suffered this hotel, for want of repairs, to fall into decay, and become unfit or undesirable as a habitation for guests and patrons, damage and loss would result to the tenant, for which it would be responsible, especially as he is bound by a covenant in the same contract of lease to " keep the hotel open and in good first-rate style " during the term.

The charge in this case shows that our learned brother was aware of these rules and did not intend to contravene them, yet they are not distinctly set forth and appositely applied to the circumstances in proof. Had the instructions upon these points been more explicit, and had they not been mixed with matters somewhat irrelevant, and calculated, perhaps, to confuse, if not to mislead, the jury, we might not have been called upon to interpose, and were this the sole ground of exception, we should hesitate either to criticise or interfere; but there are other points upon which we shall be obliged to send the case back for another hearing ; and this being so, we do not feel at liberty to point out a more specific application of principles which we conceive to be so plain and intelligible.

2. While we do not think that the loss of the contract by which the defendant sub-let the hotel to Byington & Rushing enters properly into the measure of damages resulting from a breach of the contract between the parties to this suit, by reason of its being a collateral undertaking which the parties cannot be presumed to have contemplated when they made the contract, yet we are of opinion that the matter should have been entirely withdrawn from the consideration of the jury, and they should not have been charged upon the subject as is set forth in the 19th ground of the motion for a new trial. It may possibly have bewildered and led them astray, but could not, as we think, have as-

sisted them to reach a proper conclusion. The amount found as the principal of the debt in suit exceeded the face of the paper by three hundred dollars, and had to be corrected by writing off that excess before it was reduced by the amount of damages found for the defendant. The error was corrected in this way after the verdict was returned, but it does not remove the impression that the jury failed to comprehend the instructions of the court.

3. It would have been better to have omitted from the charge, set out in the 17th ground of the motion for a new trial, all allusion to the several remedies open to the defendant for a violation of this covenant, and to have confined the instructions given to the issue formed by the defence set up by the pleadings in the case. The jury had nothing to do with any others that might possibly have been taken. Abstractly considered, every proposition laid down may have been correct, but were any of them, save the one based upon the pleadings, pertinent and applicable?

4. Byington & Rushing occupied the premises for a part of the term for which the defendant leased the hotel; and with a view of ascertaining their condition at that time, evidence, offered and rejected, that applications were made for rooms, and after inspecting them, the parties desiring to occupy rejected them, because they were somewhat out of repair, was, for that purpose, admissible. So of testimony going to show the reputation of the house with the traveling public, and the refusal of parties to patronize or stop at the hotel because it was not in a tenantable condition. So, likewise, of proof offered to show that a man, taking charge of the hotel in its condition, and having everything to furnish and the labor to employ, could not run it profitably; and we know of no other mode of ascertaining the cause of the complaints made by guests than to show what they said while at the house or after leaving it. Each of these several particulars, although they might not afford very cogent or convincing proof of the facts, were, never-

theless, admissible, as affording some evidence that the house had fallen into disrepute and ceased to be an inviting or desirable hostelry for the want of necessary repairs, and consequently that the tenant sustained loss thereby.

5. There can be little trouble as to the rule of damages that obtains in the case; but by what evidence the amount is to be ascertained is a matter of somewhat greater difficulty. The defendant, it is alleged, seeks to establish the amount of his losses by the opinions of witnesses, without the facts on which those opinions are founded, and it is urged that the case is not one that can be made out by the opinion of witnesses, although they may be experts. This position is doubtless correct; to hold otherwise would put the witnesses in the place and transfer to them the functions and duty of the jury, who are entrusted with the power of reaching conclusions from given premises; besides, it would make the rights of parties dependent, to a large extent, upon the conjectured and speculative opinions of others, no two of which would perhaps agree. On the other hand, to restrict the rule to an exact computation of the profits which the party has lost by reason of a breach of covenant would, in a large measure, deprive him of an effective remedy to secure his rights. Too rigid an application of the rules of evidence would render the stipulations designed for his protection nugatory. Particular circumstances have been allowed to vary the application of such rules, in order to make them effective in reaching the ends they were designed to secure. The defendant cannot be expected in this case to hunt up every person who left his hotel, or was deterred from coming to it, on account of the uncomfortable condition in which the building and the rooms were left for the want of these necessary repairs to render it comfortable and habitable; he can only show generally these facts and others which will enable the jury to approximate his losses and ascertain his damages; and this may be done by proving the facts that may justify the jury in reaching a conclusion, such as were pointed out by

this court in the case of *Gilbert vs. Cherry*, 57 *Ga.*, 128.

On this subject, the record is, to say the least, so obscure as to render it difficult, if not impossible, to determine what was done. This case has not been fairly tried, and justice to the parties would seem to require that another hearing should be had under the rules here prescribed. There is nothing else in this voluminous record requiring more special notice than has been given. The case has been held up and maturely, but not very satisfactorily, considered, owing to the intrinsic difficulties it presents.

Judgment reversed.