CANNON *v.* HUNT, administratrix.

1. When the owner of land and a contractor agree upon terms for the erection of a building, in a particular manner, and by the use of certain specified materials, " under the personal and direct supervision " of a named person, he having no authority other than that indicated by the words quoted, the right of the owner to have the terms of his contract complied with is not affected by the fact that such superintendent accepted a class of work and material different from that named in the contract.

2. When a contractor undertakes to do certain work (the erection of a building) within a limited period of time, the exercise of proper prudence on his part requires that the work be commenced within such a reasonable time after the execution of the contract as will enable him to finish it within the time limit, notwithstanding unusual, heavy, or constant rains ; and when it was shown in such a case that the contractor delayed the commencement of the work to a period after which he could only have finished it within the limit had the season been an ordinary one, it was error on the part of the trial judge to charge the jury, in effect, that if the contractor commenced the work at a period which would have enabled him to finish it within the time limit under ordinary conditions, but was thereafter prevented from completing it in the given time, because of unusual, heavy, and constant rains, such causes would be a sufficient excuse for a failure to construct the work within the time limit.

3. Where one claims damages from a contractor because of the failure to erect a store and office building within a given time, and the evidence supports such claim, the proper measure of damages is the rental value of the building for the time elapsing between the time fixed for its completion and the time when it was delivered and turned over.

Argued April 3, — Decided May 22, 1901.

Complaint.    Before    Judge    Fite.    Whitfield    superior    court. October 19, 1900.

*R. J. & J. McCamy* and *Mann & Terry*, for plaintiff in error. *Shumate & Maddox* and *F. S. Yager*, contra.

LITTLE, J.    This case seems to have been tried under a misapprehension of the rules of law which govern the issues raised by the pleadings and evidence.    Mrs. Hunt, administratrix, instituted her action against Mrs. Cannon, to recover what she alleged was due to

her intestate as a balance on the contract price for furnishing material and erecting a brick store and office building in the city of Dalton. The work was undertaken under a contract, the material stipulations of which are as follows: The intestate agreed to furnish all the materials and labor of every kind, and build complete, on the lot of the defendant, a brick store and office building, as shown on certain plans and set forth in certain specifications, under the personal and direct supervision of J. A. Blanton. The specifications were made part of the contract. It was further agreed that the intestate should complete the work and turn the building over to the owner on or before the first day of December, 1898; and that, in consideration of the performance of said work according to agreement, the defendant should pay to the intestate the sum of $7,650. It was alleged that the intestate performed his contract in accordance with its terms as to character of work and material, and, although there was some delay in completing the work, it was from providential cause; and that defendant accepted the work and went into possession of the building when completed; and that defendant had paid $6,000 on the contract price, leaving due thereon $1,650, which petitioner is entitled to recover. She prayed for a judgment having a special lien on the lot and building. The defendant admitted the execution of the contract, but denied liability for any sum in excess of that which she had paid, and denied also that the failure to complete the building at the time specified was from providential cause, but charged that it was on account of the fault and neglect of the intestate. Defendant also averred that intestate had used defective material in the construction of the building, and that the workmanship on the same was bad; and set out a detailed statement of particulars in which she claimed to have been injured by the use of improper material and workmanship, in an amount exceeding $3,000. Among other things she claimed that the lumber used in constructing the house was of inferior quality and unseasoned; that the cement used was not that called for by the contract, but of an inferior quality, which would not shut out water; that the roofing was not done according to contract; that the doors and windows were not according to contract; and because of these imperfections the house leaked, her goods were damaged, and it would require a considerable sum of money to obviate these defects in material and construction.

A number of witnesses were introduced for both plaintiff and defendant, but we do not find it necessary to refer to their evidence in detail. It is sufficient to say that the evidence for the plaintiff tended to show that the building was properly constructed, and, in the main, the materials used were those set out in the specifications. It was not denied that in certain particulars materials different from those described in the specifications were used in the construction of the building, but it was testified by some of the witnesses that those so used were as good as the materials which were specified. It was admitted also that the building was not completed and turned over within the time specified by the contract. On this point the evidence was conclusive as to the fact that the work on the building was not commenced for a considerable period of time after the contract had been entered into, but was commenced in time to have completed it on the date called for by the contract, but that delays were occasioned for the want of material, and, for a considerable time after work was commenced, by excessive rain and general bad weather. The evidence for the defendant tended to show the use of materials different from those specified, and also that defective material was used in the construction, in consequence of which she suffered loss; that a considerable sum of money would be required to put the building in the condition that it would have been in had proper materials been used in its construction, and the work properly done; that the building was never fully completed by the contractor, and possession was not delivered until February 15th, 1899. Evidence was also introduced in reference to the value of the building for rental purposes, and, by the plaintiff, to the fact that the material which differed from that named in the specifications was placed in the building with the approval of Blanton, the superintendent, and G. H. Cannon, the agent of the defendant. Concerning this agency Cannon testified that he represented Mrs. Cannon, his wife, in the construction of the building. The jury returned a verdict for the plaintiff for $1,492.50, and established a lien for the same on the building. The defendant made a motion for a new trial on several grounds, among others, that the verdict was contrary to law and the evidence in the case. The motion was overruled, and defendant excepted and assigns such refusal as error. Inasmuch as there is to be another trial of the case, we express no opinion on these grounds of the motion.

1. The first ten grounds of the amended motion will be considered together, inasmuch as each of them refers to instructions given to the jury in reference to the power of Blanton, superintendent, and Hunt, agent, to change the character of material specified in the contract. Among the charges of which complaint is made is the following: "Now with reference to Mr. Blanton, who it is contended here was agent of defendant for the purpose of superintending the building and seeing to it that nothing but good material was placed in there and that the work was done in a workmanlike manner, I charge you that every patent defect (that means every defect that might have been seen, or that Blanton could have seen by the exercise of ordinary care in looking after the building, and that he did see and acquiesced in, though it might have been changed from the specifications and the contract) would be binding upon the defendant; and especially so, if you find and believe that she knew of it, or that her husband acting for her knew of it and acquiesced in it at the time. Or in other words, if material was used in the building by and with the consent of Blanton, and especially so if Cannon acting as agent for defendant knew of it and was consulted about it, and it was inferior material and the house was completed in that way, then the defendant would be estopped from now denying and saying it wasn't built in accordance with the specifications." It will be noted that in this instruction the jury were specifically told that if Blanton agreed that other material than that specified in the contract should be used in the building, or if Cannon, acting as agent for defendant, knew of the change, and the material used was inferior to that specified in the contract, the defendant was bound. By the terms of the contract Hunt, the intestate, agreed to furnish a particular kind of material and construct the house for defendant in a workmanlike manner, and on her part the defendant agreed that if he would do so she would pay him a given sum of money. Each was bound to perform the terms of the agreement into which they had entered, and the defendant was no more bound to pay the sum specified than the intestate was bound to use the material and give the character of work which he had undertaken; and no other kind of material and work could be furnished or done without causing a breach of this contract, unless such change was consented to by the defendant, the other party to the contract. The charge assumes that Blan-

ton, the superintendent, as well as Cannon, the agent, was authorized to bind her in respect to these changes. No other evidence of Blanton's authority to do so appears in the record than that the building should be erected under his personal and direct supervision. Under an agency of this character he had no authority to consent to a change of the materials or of the character of workmanship specified in the contract. On the contrary the contract specified the material to be used in the building, and the manner in which it should be constructed, and it was the duty of the superintendent to see that the building was constructed in the manner specified, but it was not in his power to make any change in the contract. As a matter of law the contractor was bound to use the specified material, even if the superintendent knew of and consented to the substitution of another kind. Under the contract the powers of Blanton were limited to a supervision of the work. It is doubtless true that in a contest between the intestate and the defendant as to whether any material furnished was that specified by the contract, or whether the character of any of the work done was according to contract, he, by a decision on that question, could have bound the defendant; but his powers extended no further.

In the case of Glacius v. Black, 50 N. Y. 145, it was ruled, that when by the terms of a contract for repairing a building it was provided that the material furnished should be of the best quality, and the work performed in the best manner, subject to the acceptance or rejection of the architect, and all to be in strict accordance with the plans and specifications, and to be paid for "when done completely and accepted," the acceptance by the architect did not relieve the contractors from their agreement to perform the work according to the plans and specifications; nor did his acceptance of a different class of work or inferior materials from those contracted for bind the owner to pay for them; that the provision for acceptance was merely an additional safeguard against defects not discernible by an unskilled person. It has also been ruled, in a number of cases, that one superintending the erection of a building has no authority to make any change in the original contract. See Woodruff v. Rochester & P. R. Co., 108 N. Y. 39; Baltimore Cemetery Co. v. Coburn, 7 Md. 202. Mr. Wait in his work on Engineering & Architectural Jurisprudence, § 371, in defining the powers of an engineer connected with the supervision of the work, says: "The engineer

is an agent with special powers simply to do the engineering and to superintend and direct the work. Unless specially conferred, he has no power to contract or to vary the terms of the parties' agreement." He also quotes approvingly from Chief Justice Redfield of Vermont, who said: "No one could for a moment be led into any misapprehension as to the extent of an engineer's authority to charge the company by varying existing contracts or making new ones. The engineers are there for no such purpose." Id. § 379. In the case of *Mallard, Stacy & Co.* v. *Moody & Brewster*, 105 *Ga.* 400, our present Chief Justice, after citing a number of cases on the proposition that an architect superintending the erection of a building can not bind the employer by accepting a class of work inferior to or different from that called for by the contract, said: "Numerous other cases could be cited, announcing the same principle, but these are in our opinion sufficient to establish the doctrine that an architect has no power to change, alter, or modify the contract between the parties, and that his certificate, after he has so changed or modified the contract, that the work has been completed according to the contract, will not bind the parties." The charges complained of are contrary to the principles of law above stated; and, as these principles are sound in reason and abundantly supported by authority, it must be ruled that the trial judge erred in his instructions to the jury as set out in each of the ten grounds of the motion for a new trial. The evidence showed that Cannon was simply the agent of his wife in the construction of the building. Being possessed of only a limited authority, his assent to a change of specifications would not be binding upon her.

2. Exception is taken to the following charge of the court: "Defendant contends that she is entitled to something for rents by reason of delay. In reply to that, plaintiff says that three months was a reasonable time to complete the building under ordinary circumstances and in ordinary weather, and that her husband began the building four months or more before the time specified in the contract, but she admits that he was delayed through some cause several weeks, but contends that that delay, counting the time when the work was first begun and the remaining time up to the first of December, three months or more, was a sufficient time to complete the building under ordinary circumstances. She says further that the season wasn't an ordinary season, that it was a very

rainy season, and on that account the building wasn't completed so soon as it would have been; but for that it would have been completed before the first of December. I charge you that if that contention is true and her husband was prevented from completing it on account of providential cause, unusual or heavy rains, constant rains, by the first of December, then defendant can not recover anything by reason of the delay." When analyzed, this part of the charge lays down the proposition, that where one has contracted to construct a building within a given time, and delays the commencement of the work thereafter to a period of time in which it can be performed within the time limit in ordinary weather, and after so doing, in consequence of unusual or heavy rains during the period in which the work is in progress, the construction of the building is delayed beyond the time limit, such unusual and heavy rains operate as a discharge of the obligation to complete the work by the time specified. It will be noted that the contract in this case was entered into on the 28th day of June, 1898, and it stipulated that the building was to be completed and turned over on or before December 1, 1898; and that it was not delivered until February, 1899. The delay, as explained by some of the witnesses, was occasioned by two causes, a want of material, and bad weather. The contractor for covering the roof testified that the rains interfered with the men and they could not work. Mr. Blanton, the superintendent, said that the weather that fall was pretty good until about the middle of November, and then it got pretty rough from then on. It was in December that it got so cold they could not do any plastering for two or three weeks. The work commenced about September 1. There was a good deal of delay about getting to work. There was good weather that fall up to about the middle of November. They were about two months in beginning. All the time between the 8th of June and 1st of September was good weather. After the first story was run up, they were delayed waiting for steel eye-beams, and then for the columns to support them. The witness thought that, if the contractor had commenced work within a short time after the contract was made, he would have gotten through before the bad weather set in, but that the work was commenced in time to finish it according to contract, and that three months would have been sufficient time within which to complete the building, if bad weather

had not hindered the work. Another witness testified that there was a great deal of rain in part of October, which bothered the workmen considerably; that it was a rainy season — a very nice fall till the rainy weather began. Another, who put the plastering in the building, said, that he commenced it about four weeks before Christmas and finished on the 23d of February; that he could have completed it in five weeks if there had been good weather, but that it was raining and freezing all the time after he commenced. Another testified, that it was a very rainy fall; that it rained a great deal after the first of July during the summer; that the fall was unusually wet; that the unusual rain commenced in September; that there was occasionally good weather, but it was the wettest fall witness had ever known; that this wet weather destroyed the corn on the river and creek bottoms; and that the unusual wet weather delayed the completion of other buildings.

It was on this, and similar evidence from other witnesses, that the judge predicated the charge complained of. In thus instructing the jury the trial judge doubtless had in view the principle of law which renders delay in the observance of the terms of a contract, from providential cause, a defense to an action brought for its breach; but it is our opinion that the charge given does not correctly state this principle. On the contrary, the fact that the season was not an ordinary one, that it was very rainy, and that on that account the building was not completed within the time specified, can not successfully be urged as a reason excusing the delay. Constant, unusual, or heavy rains can not of themselves be classed as a providential hindrance. Even if the cause which delayed the completion of the building could be denominated a providential cause, it would not afford a legal excuse for the delay, if it be shown that the period of time between the making of the contract and the happening of the cause was sufficient within which the building could have been completed. By the Civil Code, § 3725, which refers to the performance of a contract, it is declared: "If such performance is impossible, and becomes so by act of God, such impossibility is itself a defense equivalent to performance; but if, by proper prudence, such impossibility might have been avoided by the promisor, it ceases to be an excuse for non-performance." In the case of *Fish* v. *Chapman*, 2 *Ga.* 349, Judge Nisbet quotes approvingly the definition by Judge Story and Chancellor Kent as to

what is such a providential cause as will excuse a delay in the performance of a contract, as follows: "What then are *acts of God or unavoidable accidents?* for it is from these only, that this party is protected.  By the act of God is meant, any accident produced by physical causes which are irresistible; such as lightning, storms, perils of the sea, earthquakes, inundations, sudden death or illness. . . The act of God excludes all idea of human agency." He also cites McArthur *v.* Sears, 21 Wend. 190, for the proposition that "no matter what degree of prudence may be exercised by the carrier or his servants, although the delusion by which it is baffled or the force by which it is overcome be inevitable, yet if it be the result of human means the carrier [in that case] is responsible." In the case of *Doster* v. *Brown,* 25 *Ga.* 26, Judge Lumpkin, delivering the opinion of this court, said: "While every shower of rain that falls upon the earth is the act of God, in contradistinction to the act of man, yet an ordinary freshet is not the act of God, in the legal sense which protects a man against responsibility for the nonperformance of a contract. . . If by skill and labor the work can be done by man so as to resist the ordinary, or what may be called the extraordinary floods, which often occur, but at long intervals, and the work is carried away, it can not be attributed to the act of God." Judge McCay in the case of *Central Line of Boats* v. *Lowe,* 50 *Ga.* 511, says that "the act of God" covers only natural accidents such as lightning, earthquakes, tempests, and the like, and not acts arising from the negligence or act of man.  In the case of *Wallace* v. *Clayton,* 42 *Ga.* 447, the same learned judge said that if the loss be by reason of the want of extraordinary diligence in the carrier, then, though the agent of the loss be flood or storm, the carrier is liable.  It is a sound proposition of law that "a party may, by absolute contract, bind himself to perform things which subsequently become impossibilities, or to pay damage for their non-performance, and such construction is to be put upon an unqualified undertaking, when the event which causes the impossibility might have been foreseen and guarded against, or when the impossibility arises from the act or default of the promisor." Wait's Eng. & Arch. Jur. § 669.

We have thus referred to cases containing definitions of "acts of God," and establishing the rule when such causes may be said to excuse the performance of the terms of a contract, for the purpose

of testing the correctness of the application of the principle as given by the trial judge in his instructions to the jury. In effect, the charge makes every rainy season, unusual or heavy rains, constant rains a sufficient cause to excuse the breach of a contract when time is of its essence. It is our opinion that the principle of law referred to can not be so extended. It was shown in this case that there were intervals in which the work could have been done between the rains and freezes. Constant rains and freezes are natural and may be expected during the winter months, and hence must be considered within the contemplation of the parties when the contract was executed ; and it can not be that the occurrence of these expected events will relieve a party from an obligation he has incurred to perform work within a given period. But there is another reason which, in our opinion, conclusively renders the proposition stated in the charge erroneous. The contractor had from June 8 to December 1 to complete the building. It was shown that it could have been completed in three months. Of course the contractor could have commenced the construction of the building at his own convenience, as it was not otherwise stipulated, without any liability, provided it was completed within the time named. But if he suffered two or three months of this time to pass without entering upon the work of construction, he took the risk of the failure to complete it within the remaining period; and even if the causes assigned amounted to a providential cause, he could not urge that as a defense, when it is shown that he could have done the work within the time, and before these alleged causes occurred. Having no right to anticipate that the weather would be ordinary, that there would be no heavy rains, constant rains, or freezes, prudence would have required such an early commencement of the work as would have allowed him to finish it notwithstanding these delaying causes. Impossibility of performance by providential cause can not, under the terms of our law, be urged as a defense or excuse for non-performance, when the impossibility might have been avoided by the promisor by proper diligence. The judge distinctly charged the jury that if the contractor commenced the work in time to have completed it within the limit had the season been an ordinary one, this would have been a sufficient excuse for non-performance. The charge, we think, was error.

3. We think the trial judge also erred in his instructions to the

jury as to the measure of damages which the defendant would be entitled to have in the event the plaintiff's intestate was negligent because of his failure to complete the building in time. In effect, he charged the jury that the defendant would be entitled to recover (in that event) for the rent she had to pay out, if she did so pay, or what the house she occupied was worth for rent, together with what the office rents (in the new building) were worth, if she rented them or could have rented them, and, in this connection, that the jury should determine what the rents of the house occupied by defendant were, up to the time she went into the new building. In our opinion the proper measure of damages was not what the house she was occupying was worth for rent, nor the rent she paid. She contracted for a building to be delivered to her at a particular time. For the breach of this contract, if there was a breach, she was entitled to have as damages the worth of the new building for rent from the time it should have been completed under the contract to the time it was completed; and we can not see that the rent of the building which she occupied between these intervals entered at all into consideration in the assessment of such damages. Her right was, if the facts supported her contention, to have the new building. The damages which she sustained were properly to be measured by her deprivation of it for the time shown.

*Judgment reversed. All the Justices concurring.*