## 56575. NORAIR ENGINEERING CORPORATION et al. v. SAINT JOSEPH'S HOSPITAL, INC.

WEBB, Judge.

St. Joseph's action against Norair, instituted in January, 1971, and ultimately involving some twenty-two separate parties, claims a series of alleged defects which

occurred in a number of specific areas during construction of a hospital in Savannah. Damages were sought based on the cost of remedial work by others, for delay and loss of use, and various miscellaneous items.

A general statement of facts in this prolonged multi-party and multi-issue litigation appears in *Frank B. Wilder & Assoc. v. St. Joseph's Hosp.*, 132 Ga. App. 373 (208 SE2d 145) (1974). Prior to that decision the auditor had completed evidentiary hearings (3732 pages of testimony and 294 separate exhibits), but his final report was not made until June 1, 1976. He awarded to St. Joseph damages against Norair of $437,454.65, plus interest thereon of $50,318.52, and also $195,505.48 representing outstanding unbonded liens filed against the hospital by various subcontractors and materialmen.

Both Norair and St. Joseph filed exceptions. The superior court sustained the auditor's findings, making some mathematical adjustments agreed to by both parties, and entered its "Opinion, Order and Judgment" on October 12, 1977. Thereafter on January 4, 1978, upon motion by Norair the judgment was revised by deleting any recovery on the unbonded claims, such amounts to be determined finally as the auditor made his reports on each satellite claim. On the same date, pursuant to motion by St. Joseph, the trial court entered a further order confirming its earlier judgment of October 12, 1977, as revised, and expressly declaring it to be a final judgment between Norair and St. Joseph in accordance with the provisions of Code Ann. § 81A-154 (b).

From this judgment Norair appeals, asserting six alleged errors succinctly set forth in questions hereinafter considered as the issues of the case.

Briefly repeating some of the facts as found in *Wilder,* supra, in February, 1967, St. Joseph contracted with Mike Bradford & Company for the construction of a new hospital in Savannah. Approximately one year after construction began Bradford defaulted and abandoned the project. Continental Casualty Company, Bradford's surety, became obligated to provide for completion of the hospital building. Continental obtained three bids, the successful bidder being Norair.

To accomplish the objective of continuity of work

begun by Bradford, Continental sought to have the completion contractor use as many of Bradford's subcontractors and suppliers as possible. Accordingly, Continental prepared as a part of the completion contract bid documents, and subsequently as a part of the completion contract itself, a special addendum (Special Addendum No. 2) expressly reserving to Continental the right to designate which subcontractors and suppliers the completion contractor would use in completing the project. The language of that addendum applicable to this issue of subcontractor selection reads:

"2. Whenever in this, or other addenda allowances are given by virtue of either a Subcontract or Purchase Order having been executed by the Original Contractor, Mike Bradford and Company, Inc., that Subcontractor or supplier will be made available to the Completion Contractor under the same terms and conditions contained in the Subcontract or Purchase Order. Adjustments to the allowances will be made after the selection of a Contractor. All adjustments will be subject to a 10% increase if the adjustment is upward or an additional 10% decrease if the adjustment is downward. In the event any Subcontractor or supplier, as presented herein, cannot be presented to the Completion Contractor, Continental Casualty Company reserves the right to secure a replacement Subcontractor or supplier, or at Continental Casualty Company's sole option to permit the Completion Contractor to secure its own Subcontractor or supplier subject to Continental Casualty Company's approval of the cost therefor."

Norair and the other completion contract bidders were not given the names of the subcontractors they would be required to use when they submitted their bids. The contract, although negotiated by Continental, was executed between Norair and St. Joseph, and the latter acknowledged that Continental's work had been as agent for St. Joseph.

The completion contract with Norair, executed on June 14, 1968, provided for completion by August 14, 1969. Subsequently by amendment two more floors were added, and the completion date was extended 60 days. Additional time extensions postponed the completion

date to June 15, 1970, and the hospital actually occupied the building on June 27, 1970. Norair was terminated by St. Joseph on September 3, 1970, and after that date was denied access to the project and the right to do any further work, including any corrective work which later became items for which damages were claimed.

1. We thus come to the first issue presented. Who is liable between the owner and the general contractor for defective construction performed by subcontractors who were selected by the owner under a special clause in its contract with the general contractor which reserved to the owner the exclusive right to designate specific subcontractors to perform portions of the work covered under the general contract?

The auditor noted the significance of this issue in finding that "much of the work about which the hospital complains was performed by these subcontractors which Norair inherited from Bradford. If Norair is correct that it cannot be liable to the hospital for the work of subcontractors selected by an agent of the hospital, then much of the case against Norair crumbles." On the contrary, we conclude that Norair was well apprised of its liabilities, which were set forth in the general conditions of the contract negotiated and agreed to by both parties in 1968.

General Conditions No. 21 (b) states that "The Contractor shall be as fully responsible to the Owner for the acts and omissions of subcontractors, and of persons employed by them, as he is for the acts and omissions of persons directly employed by him." In addition, Norair had actual knowledge that it was to employ to the extent requested all major subcontractors and suppliers to the original contractor when it bid on the contract. In fact, a contractor with a lower bid was rejected because it was unwilling to agree to this proposal. Further, the invitation to bid contained a provision made a part of the final contract allowing Norair to terminate the employment of any subcontractor at any time who "failed to prosecute the work with promptness, diligence and efficiency or to perform any of the requirements hereof . . .," and Norair incorporated the same provision in its agreements with the subcontractors. None of the

inherited subcontractors was objected to by Norair, and at least three of the subcontractors whose work was deficient were not chosen by St. Joseph, but by Norair.

Norair relies primarily on *Peabody Mfg. Co. v. Smith,* 94 Ga. App. 240 (94 SE2d 156) (1956) to support its contention that the contract by reserving the right to require Norair to employ Bradford's subcontractors in effect substituted St. Joseph as the employer. That suit was in tort, however, and involved the issue of whether the relationship of employer and contractor within the purview of Code § 105-502 existed between the contractor and subcontractor. We agree with the finding of the auditor that the *Peabody* case is not controlling in any context except that of tort law.

The evidence is convincing that Norair was content to use the original subcontractors, that it was not without remedies for its liabilities, and that it would never have been awarded the completion contract unless it had agreed to the provisions relating to selection and approval of subcontractors. Thus Norair is hoisted on its own petard and cannot now contend that this condition modified, superseded or otherwise diluted the effect of Paragraph 21 of the General Provisions so as to reduce its responsibilities thereunder.

2. Can a general contractor assert as a partial defense against a claim by the owner for defective construction the fact that the owner's architect increased the owner's damages by negligent performance of his responsibility to supervise construction?

Norair insists that the architect, pursuant to his agreement with St. Joseph,[1] undertook to supply a full-time project inspector, and that certain problems were at least partially attributable to the architect's failure to give proper supervision to the job; and that the architect and his principal, St. Joseph, are chargeable by law with knowledge of any defects and St. Joseph's failure to act on this constructive knowledge represents a failure to mitigate damages.

However, General Condition 52 (a) of the completion

---

[1] Initially St. Joseph had not required the continuous on-site inspection of a project supervisor, but following

contract recites that "Except as otherwise specified all work shall be guaranteed by the contractor against defects resulting from use of inferior materials, equipment or workmanship. . ." Thus this issue has been settled adversely to Norair by our Supreme Court in *Mallard, Stacy & Co. v. Moody & Brewster,* 105 Ga. 400, 404 (31 SE 45) (1898), which established the doctrine that "an architect has no power to change, alter or modify the contract between the parties, and that his certificate, after he has so changed or modified the contract, that the work has been completed according to the contract, will not bind the parties." Hence, "When the owner of land and a contractor agree upon terms for the erection of a building, in a particular manner, and by the use of certain specified materials, 'under the personal and direct supervision' of a named person, he having no authority other than that indicated by the words quoted, the right of the owner to have the terms of his contract complied with is not affected by the fact that such superintendent accepted a class of work and material different from that named in the contract." *Cannon v. Hunt,* 113 Ga. 501 (1) (38 SE 983) (1901).

Significantly, although Norair argues that the architect should have discovered the defects during the early stages of construction, its president admitted under oath that the primary obligation is on the contractor to do a proper job regardless of negligent supervision by the architect, because "We are charged with the ultimate end result, it is our responsibility. . ." This was a solemn admission in judicio against its own interest which works an estoppel under Code § 38-114. "A party testifying in his own behalf is not entitled to a finding in his favor if that version of his testimony which is most unfavorable to him shows that he is not entitled to recover. [Cits.]" *Robertson v. Carroll Furniture Co.,* 54 Ga. App. 841, 842 (2) (189 SE

---

Bradford's default St. Joseph wrote the architect to arrange for such a full-time inspector to be paid by St. Joseph. The inspector was hired in April or May, 1968, before Norair's contract with St. Joseph was executed, and he remained on the job the entire time Norair was engaged in constructing the hospital.

273) (1936). Therefore, it was conclusively established that Norair is solely responsible for these defects.

3. Do the time limitation provisions of an express guaranty against construction defects limit the owner's right to recover damages for such defects to those determined to have fallen within the time limitations set forth in the guaranty?

Norair asserts that because General Condition 52 (a) limits the guarantee of work to "one year from the date of final completion of the contract," it is not liable for defects not appearing until after the expiration of that period. While there are no Georgia cases dealing with this precise issue, a Fifth Circuit Court case appealed from the Northern District of Georgia is squarely on point, and we are convinced, as was the auditor, that its holding that the twelve-month guarantee should not be interpreted as a limitation upon the contractor's liability for defective work is correct. Burton-Dixie Corp. v. Timothy McCarthy Const. Co., 436 F2d 405 (CA 5, 1971).

Norair contends that the guarantees in its contract were different from those in the Burton-Dixie case, but we find them to be strikingly similar.[2] Adopting the construction of a Texas case based on the manual designed for use in interpretation and construction of the

---

[2]Article 20 of the General Conditions in the Burton-Dixie contract recites: "The Contractor shall remedy any defects due to faulty materials or workmanship. . . within a period of one year. . ." Burton-Dixie, supra, at p. 409, fn. 3. General Condition 52 (a) of Norair's contract provides that "all work shall be guaranteed by the Contractor against defects resulting from the use of inferior materials, equipment or workmanship for one year. . ."

Article 25, General Conditions, Burton-Dixie contract: "No certificate issued nor payment made to the Contractor . . . shall be an acceptance of any work or materials not in accordance with this contract." Burton-Dixie, supra, at p. 411, fn. 6.

General Conditions 28 (h), Norair contract: "No payments, however final, or otherwise, shall operate to release the Contractor or his sureties from any obligations

A.I.A. standard contract documents,[3] the Burton-Dixie Court held that a provision requiring corrections of defects appearing within a year is actually "an added guarantee, inserted in the contract to extend rather than limit the contractor's liability for faulty construction. As such, it does not prescribe the owner's exclusive remedy, and it in no way impairs the contractor's general obligation to perform his contract in a proper, workmanlike manner. Suing for breach of contract, Burton-Dixie did not rely on the special one-year guarantee. Therefore, whether the defect appeared within one year of Burton-Dixie's occupancy is immaterial to its right of recovery." Burton-Dixie, supra, at pp. 410-411. Thus, as long as the evidence established that the alleged defective conditions were caused by Norair's faulty construction, St. Joseph is entitled to damages regardless of when the defect first appeared, so long as the suit is brought within the pertinent statute of limitations.

4. Can the general contractor be held liable for any part of the cost to replace a roof when at the time it was denied further access to the job site by the owner the roof was easily capable of being repaired?

St. Joseph sued for the full amount for the replacement of the roof, $115,282. Norair responded that the roof could have been saved, that it was St. Joseph's obligation to do so, and that by failing to take proper steps St. Joseph was not entitled to recover any amount for the

---

under this contract or the Performance and Payment Bonds."

[3] Article 20 of the General Conditions of this standard form contract provides: "Neither the final certificate, nor payment, nor any provision of the contract documents shall relieve the contractor of responsibility for faulty materials or workmanship, and, unless otherwise specified, he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of substantial completion." See Houston Fire &c. Ins. Co. v. Riesel Ind. School Dist., 375 SW2d 323, 325 (Tex. Civ. App. 1964).

replacement of the roof. The auditor did not agree with either position but awarded St. Joseph $63,859.64, based on the finding that St. Joseph's failure to correct the defects noted in two 1970 inspections was a major factor contributing to the eventual ruin of the roof system, even though Norair was obligated to furnish a proper roof. Exceptions to this finding by both parties were overruled by the superior court. We decline to speculate, as Norair would have us do, as to whether the evidence supported the apportionment of the cost, or whether timely repairs could have saved the roof.

Although it appears that all exceptions to the auditor's findings of fact were passed on by the trial judge without being submitted to a jury for determination as required by Code § 10-402 in actions at law, no error is assigned on this failure and this constitutes a waiver thereof. *Adams v. Bishop,* 42 Ga. App. 811 (6) (157 SE 523) (1931). The roof defects and its subsequent total failure were amply documented. Therefore, since the evidence was sufficient to support the findings of fact made by the auditor, the trial judge did not err in overruling them. *Simonton Const. Co. v. Pope,* 95 Ga. App. 211, 219 (4a) (97 SE2d 590) (1957). And where the findings of law are sustained by the findings of fact, there is no merit in exceptions to the auditor's findings of law. *Williams v. Northern States Envelope Co.,* 210 Ga. 787 (2) (82 SE2d 830) (1954).

5. Can the auditor award damages against the general contractor for alleged defective work in a particular trade, while finding that the subcontractor who did the work found to be defective had performed in a proper manner and without fault?

The auditor assessed damages in the amount of $23,466.13 against Norair for the correction of defective painting resulting from the peeling and flaking of the original paint from interior walls, which the paint supplier attributed to trapped moisture in the walls. In a cross claim against Pass, the painting subcontractor, Norair asserted this amount as an offset against the amount claimed by Pass as due from Norair under its subcontract. This offset was disallowed by the auditor who found that Pass did the best it could under

exceptionally difficult circumstances: serious moisture problems prevailed in the building; no heat or air conditioning was supplied to the building by Norair as required by the contract; very little air circulating equipment was made available; and constant pressure was being applied by Norair and the architect's inspector to speed up and finish the work.

Norair insists that if its subcontractor was found to have exercised due diligence so as to be absolved from responsibility for the ultimate peeling and flaking of the paint, this due diligence should also be available to Norair in order to defeat St. Joseph's claim for the cost of repainting. This argument, however, overlooks the specific finding that "Norair's failure to comply with Paragraph 40 of the General Conditions [requiring the contractor to "provide all heat, fuel and services necessary to protect all work and materials against injury from dampness and cold until final acceptance. . ."] is the sole reason for all of the paint problems not attributable to the intrusion of water through and around the windows." Thus Norair's liability is in no way dependent upon the quality of the subcontractor's work, since the duties Norair performed negligently were not attributable to the work done by Pass. The findings of fact being supported by the evidence, the conclusion of law based thereon must be affirmed. *Williams v. Northern States Envelope Co.,* 210 Ga. 787 (2), supra.

6. Does interest run on an unliquidated claim in a construction case from the date construction was completed or from the date final judgment was entered in the case?

Allowance of interest in actions for unliquidated damages arising from breach of contract is governed by Code § 20-1408 which states: "In all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time [until] the recovery." *Tifton &c. R. Co. v. Butler,* 4 Ga. App. 191 (1, 2) (60 SE 1087) (1908). Although it is reversible error for a judge to instruct the jury that they must award interest in such cases, the jury may, in their discretion, increase the immediate amount of damages found by an allowance of interest. *Tifton,*

supra, at 191.

"In most instances an auditor's report is viewed in the same respect and effect as the verdict of a jury. See *Hardy v. Rylee,* 182 Ga. 618 (186 SE 727)." *Cochran v. Bell,* 106 Ga. App. 106, 107 (126 SE2d 283) (1962); and a judge sitting without a jury may also in his discretion augment damages by the addition of legal interest. *Bennett v. Tucker & Pennington,* 32 Ga. App. 288 (123 SE 165) (1924). We see no reason why this discretion should not apply to an auditor.

This court determined in the *Tifton* case that "in those breaches of contract where monetary loss immediately and necessarily flows to the injured party, usually 'nothing less than the actual amount of the loss and the interest thereon will compensate.' [Cits.]" 4 Ga. App. at 194. Here, the auditor found as a fact that the hospital's damages were complete at the time St. Joseph took over the building and gave its notice of final release and acceptance, on June 20, 1970. The evidence is replete that monetary loss "immediately and necessarily" flowed to St. Joseph as a result of the defective building.[4]

*Cochran v. Bell,* 106 Ga. App. 106, supra, relied on by Norair as the exclusive authority on interest, is not controlling. There interest was added on to the auditor's award of damages by the superior court judge rendering judgment, to run from the date of judgment as a *liquidated* claim. The plaintiff argued that the amount was liquidated from the date of the auditor's report, but this court held that the amount became liquidated from the date the superior court rendered the decree. Thus, a recovery for breach of contract may be awarded interest for two periods: (1) the fact finder may within its discretion in a proper case award interest from the date of

---

[4]I.e., parts of the building were unusable due to extensive leaks in the roof and windows; some of the hospital personnel, while being paid by St. Joseph, had to do emergency clean-up work; the hospital's opening was delayed due to defects, thereby causing likely lost services; and a patient was injured due to a defective grab bar, resulting in a lawsuit.

the breach on the *unliquidated* claim; and (2) a claimant is entitled to interest from the date a claim becomes *liquidated* as a matter of law. St. Joseph is entitled to the interest awarded by the auditor as a fact finder on its unliquidated claim.

*Judgment affirmed. Quillian, P. J., and McMurray, J., concur.*

ARGUED SEPTEMBER 7, 1978 — DECIDED OCTOBER 2, 1978 — REHEARING DENIED OCTOBER 18, 1978 — 

*Friedman, Haslam & Weiner, Bruce A. Howe, Edwin A. Friedman,* for appellants.

*Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, E. Ormonde Hunter, Arnold C. Young, John B. Miller, Adams, Adams, Brennan & Gardner, Edward T. Brennan, Richard J. Harris, Bouhan, Williams & Levy, Walter C. Hartridge, Hendrix & Shea, John W. Hendrix, John Wright Jones, Pierce, Ranitz, Berry & Mahoney, Dennis Pierce, John F. M. Ranitz, Jr., Galin & Friedman, Calhoun & Associates, John R. Calhoun, Charles E. Moore, Aaron L. Buchsbaum, Lawton, Sipple & Chamlee, George H. Chamlee, Fendig, Dickey, Fendig & Whelchel, Albert Fendig, Jr., Smith, Currie & Hancock, Edward H. Wasson, Jr.,* for appellees.