A91A1955. McDEVITT & STREET COMPANY v. K-C AIR
CONDITIONING SERVICE, INC. et al.

(418 SE2d 87)

BEASLEY, Judge.

Plaintiff McDevitt & Street Company sued defendants K-C Air Conditioning Service, Inc., and its surety, Employers Insurance of Wausau, to recover damages allegedly sustained as the result of the breach of a construction subcontract. Plaintiff appeals a judgment entered on a jury verdict in favor of defendants.

On February 26, 1985, plaintiff as general contractor and K-C as subcontractor entered into a written agreement (the subcontract) for the design, purchase and installation of a waste water riser system in an Embassy Suites Hotel. The agreement provided that "[t]he work shall be performed by subcontractor in a good and workmanlike manner strictly in accordance with the Contract Documents. . . ." It further contained a guarantee whereby "Subcontractor warrants and guarantees the Work to the full extent provided for in the Contract Documents. Without limiting the foregoing or any other liability or obligation with respect to the Work, Subcontractor shall, at its expense and by reason of its express warranty, make good any faulty, defective, or improper parts of the Work discovered within one year from the date of acceptance of the project by the Architect and Owner or within such longer period as may be provided in the Contract Documents."

Specified as a "Contract Document" and specifically incorporated into the agreement, was an American Institute of Architects (AIA) contract A201, 1976 Edition as amended by Supplementary Conditions. In an article of that AIA contract pertaining to subcontractors, it was specified that "the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor by these documents assumes toward the Owner and the Architect." Pursuant to that AIA agreement, the Contractor warranted to the Owner that "[a]ll Work will be of good quality, free from faults and defects and in conformance with the Con-

tract Documents. All Work not conforming to these requirements . . . may be considered defective. . . . This warranty is not limited by the provisions of Paragraph 13.2." Paragraph 13.2.2 related to "correction of work" and required that if within "one year after acceptance by Owner . . . or within such longer period of time as may be prescribed by law . . . any of the Work is found to be defective or not in accordance with contract documents, the contractor shall correct it promptly after receipt of written notice to do so" unless Owner has "given a written acceptance of such condition. This obligation shall survive termination of the contract."

The subcontract further required K-C as subcontractor to furnish "a performance bond . . . in an amount equal to the [contract] Price [$1,564,500.] . . . with surety or sureties satisfactory to Contractor." In compliance with that requirement, K-C posted a "subcontractor performance bond" with defendant Wausau. The bond was to remain in full force and effect, obligating Wausau as surety, until such time as "[K-C] shall well and truly perform all the undertakings . . . and conditions and agreements of [the] subcontract within the time provided therein . . . and during the life of any guaranty required under [the] subcontract, . . . and shall indemnify and save harmless [plaintiff] of . . . any loss, damage, and expense, including costs and attorney's fees, which [plaintiff] may sustain by reason of failure to do so. . . ."

Embassy Suites opened for business in December of 1985. In early February of 1988, plaintiff received complaints about ten random leaks that were occurring in the plumbing risers in the hotel. On four or five different occasions ceiling tiles fell and raw sewage leaked from the guest rooms into the restaurant and meeting rooms below. On each occasion, a guest suite was out of service for three days. Such leaks were occurring randomly throughout the system with more frequency, at a rate of approximately one a week.

By letter dated February 4, 1988, Plaintiff provided both Subcontractor and Wausau with "formal notice of a claim against the . . . subcontract," due to "mechanical connections [which] have failed throughout the building," resulting in "damage caused by [ ] sewage flowing from the failed joints," and requested that Wausau assign an adjustor to investigate before "we start the repairs to the mechanical system." Wausau acknowledged receipt of plaintiff's February 4 letter, and although it responded that it would investigate the problem with its principal, plaintiff received no confirmation that such an investigation had been conducted.

Plaintiff arranged a meeting on February 5 to review the problem with all those involved. Representatives of K-C were present, but Wausau declined to be represented. A decision was made to randomly open certain wall cavities to assess the problem. Upon doing so, it

became apparent that segments of pipe throughout the system had been improperly bonded. It was thought that the defect could potentially result in future leaks.

That information was presented at a second meeting which was held on February 8. It was agreed upon that a system-wide failure had occurred and a "decision was made to replace all the proset sleeves because no one was comfortable with the fact that [they] wouldn't be back doing patch jobs again, again and again."

Analysis of the couplings removed from the building revealed an adhesive failure due to contaminated cement that was used at the joints. This resulted in a system with a propensity to leak. Approximately 85-95 percent of the couplings examined were affected in that manner. K-C had installed at least 2,200 couplings of a similar nature in the hotel.

Although plaintiff offered K-C the opportunity to correct the problem, it declined. Plaintiff paid another subcontractor $151,986.97 to perform the repair.

Plaintiff informed Wausau that it would negotiate a settlement of the claim with Embassy Suites. It later sent K-C an itemized invoice reflecting payments totaling $338,594.57 it had expended for repairs and losses to the owner. Plaintiff sought reimbursement for those expenses from both K-C and Wausau under the performance bond. Both denied liability.

Plaintiff filed the present multi-count complaint seeking actual damages against K-C for negligence, breach of contract, breach of express and implied warranties, and expenses of litigation resulting from its alleged bad faith refusal to pay the claim. The complaint further alleged joint and several liability on the part of Wausau for K-C's failure to perform. It sought actual damages, a 25 percent bad faith penalty and attorney fees from the surety.

1. Although plaintiff contends that it was entitled to a directed verdict in its favor as a matter of law, no such motion was presented below. It cannot now be made the basis for appellate review. See generally *Fidelity &c. Ins. Co. v. Massey,* 162 Ga. App. 249 (1) (291 SE2d 97) (1982). Appellant cites *Denny v. D. J. D., Inc.,* 188 Ga. App. 431 (373 SE2d 383) (1988), as authority for its position, but in that case the plaintiff had raised the issue before the trial court in a motion for new trial, and it was the denial of that motion which was reviewable. There was no such motion in this case.

2. Plaintiff contends that the trial court erred in granting defendants' pre-trial motion in limine, and excluding from the trial of the case any evidence of a default provision of the subcontract.

The operative provision specified: "Should Subcontractor at any time: fail to supply the labor, materials, equipment, supervision and other things required . . . of sufficient quality to perform the Work

with the skill [and] conformity . . . required hereunder . . . or fail in the performance or observance of any of the covenants, conditions, or other terms of this subcontract, . . . each of which shall constitute a default hereunder by Subcontractor, Contractor shall, after giving Subcontractor notice of default and 48 hours within which to cure, have right to exercise any one or more of [four specified] remedies." These included correcting the work through others and recovering from subcontractor all losses, damages and reasonable attorney fees incurred by reason of the default.

The trial court's ruling was apparently predicated on a finding that the default provision applied only during performance and within the one-year warranty period. However, as K-C concedes, the express warranty provision of the subcontract was not an exclusive remedy. Correction of the work was required within the first year "or such longer period of time as may be prescribed by law." K-C was contractually obligated to provide the labor, material and equipment necessary to perform good quality work, free from faults and defects, and an event of default was deemed to have occurred should the subcontractor "at any time" fail to do so.

Evidence showed that the defect resulted from improper bonding of the pipe joints (couplings) due to an adhesive failure. There was at least some evidence to support a finding that the defect was attributable to K-C's failure to provide good quality materials and/or workmanship. Under an indemnification provision of the subcontract, K-C was required to "indemnify and save harmless Contractor . . . from and against any liability, loss, damage, or expense arising out of" any claim asserted by owner against plaintiff "involving the sufficiency of the performance of the Work." Refusal on the part of K-C and Wausau as its surety to indemnify plaintiff for the claim asserted by Embassy Suites is evidence of failure to perform under the indemnification provision. Even if the default provision had no applicability after the expiration of the one-year warranty period, there was evidence that leaks in the system were manifested "from the beginning of the time Embassy Suites was there."

K-C nevertheless asserts that the default provision is inapplicable because plaintiff failed to provide the contractual requirement of notice and 48 hours within which to cure. Plaintiff's February 4 letter was sufficient to demonstrate notice and opportunity to correct the defect.

As there was evidence from which the jury could conclude that defendants were in default of the subcontract, the trial court abused its discretion in excluding that provision from their consideration. Compare *Department of Transp. v. Wright,* 169 Ga. App. 332 (1) (312 SE2d 824) (1983).

3. Plaintiff contends that the trial court erred in directing a ver-

dict on damages which it paid to Embassy Suites in settlement of the hotel's claim.

Embassy Suites sent plaintiff an itemized statement setting forth damages of $135,768.50 it had incurred as the result of the construction defect and subsequent repair. This statement was received into evidence through the testimony of plaintiff's risk manager who had personally investigated the charges and reimbursed the hotel. He testified that the charges were considerably less than he had estimated, since the hotel had not billed for loss of occupancy for each night that rooms were out of service but based its calculations on past occupancy rates. He stated that the charges appeared reasonable based on his independent calculations and estimate.

OCGA § 13-6-8 allows for recovery, in contract cases, of "profits which are the immediate fruit of the contract, and are independent of any collateral enterprise entered into in contemplation of the contract." Where a defendant's breach of contract causes a hotel to lose business, compensation for lost income is recoverable. *Stewart v. Lanier House Co.,* 75 Ga. 582 (1) (1885) (interpreting predecessor to OCGA § 13-6-8). The hotel operator need only "show generally [the] facts . . . which will enable the jury to approximate his losses and ascertain his damages"; for to compel him to do more than this would "deprive him of an effective remedy to secure his rights." Id. at 601 (5). "Lost profits, i.e., lost rental income, is recoverable as damages if shown with reasonable certainty." *Getz Svcs. v. Perloe,* 173 Ga. App. 532, 536 (327 SE2d 761) (1985).

"A motion for directed verdict is to be granted only where there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions, demands a particular verdict. OCGA § 9-11-50 (a)." *Doyle v. Estes Heating &c., Inc.,* 173 Ga. App. 491, 493 (3) (326 SE2d 846) (1985). The evidence is construed most favorably to the nonmovant. *Davis v. Glaze,* 182 Ga. App. 18 (354 SE2d 845) (1987).

Plaintiff established sufficient proof of the business interruption claim to withstand the direction of a verdict.

The parties also argue about the direction of a verdict on certain markups and attorney fees as damages, but these are not embraced in this enumeration of error and are dealt with in Divisions 4 and 5, infra, which address the separate enumerations of error.

4. Plaintiff contends that it was entitled to have the jury consider an additional 15 percent markup (10 percent overhead and 5 percent profit) on the actual damages as a remedy provided under the default provision of the subcontract. However, the evidence did not establish plaintiff's entitlement to exercise that remedy, which was applicable when monies were due the subcontractor or in the event of termination of the subcontract by the contractor. Although plaintiff

further asserts entitlement to such additional damages for the general contractor or supervisor as "industry custom," the evidence did not establish that plaintiff acted in such capacity with respect to the repair work. The trial court properly directed a verdict in favor of K-C with respect to this claim for additional damages.

5. The trial court erred in directing a verdict with respect to plaintiff's claim for expenses of litigation under OCGA § 13-6-11. Mere refusal to pay a disputed claim without suit is not sufficient to support an award of expenses of litigation, nor are they authorized where a bona fide controversy exists. However, "[q]uestions of bad faith, stubborn litigiousness, and unnecessary expense, under OCGA § 13-6-11, are generally questions for the factfinder. [Cit.]" *Manderson & Assoc. v. Gore,* 193 Ga. App. 723, 735 (9) (389 SE2d 251) (1989). It was for the jury to determine whether there was a bona fide controversy in this case.

6. Plaintiff enumerates as error the grant of Wausau's motion for a directed verdict as to its liability under the performance bond.

The performance bond obligated Wausau as surety until K-C has performed all the undertakings, conditions and agreements of the subcontract "within the time provided therein . . . and during the life of any guaranty required under the subcontract." The court construed the document to unconditionally relieve Wausau from liability under the bond at the conclusion of the one-year warranty period. However, K-C was obligated under the subcontract to make good any defective work discovered within one year from the date of acceptance "or within such longer period as may be provided within the contract documents." The relevant portion of the AIA contract, recited earlier, expressly states that the one-year provision does not limit the warranty, and extends it to the "period of time as may be prescribed by law." The statute of limitation is six years. OCGA § 9-3-24. This construction is consistent with the indemnification provision of the subcontract requiring K-C to indemnify plaintiff in the event of its default, without limitation as to time or scope.

"Sureties . . . are jointly and severally liable with their principal unless the contract provides otherwise." OCGA § 10-7-1. Since Wausau's obligation under the bond remained in full force and effect until K-C's obligations under the subcontract were terminated, and there was evidence that K-C did not "well and truly perform" within the statute of limitation, the trial court erred in directing a verdict in Wausau's favor.

7. Plaintiff also submits that the trial court erred in directing a verdict in Wausau's favor for a statutory bad faith penalty and attorney fees pursuant to OCGA § 10-7-30.

"In the event of the refusal of a corporate surety to . . . commence performance in accordance with the terms of a contract of

suretyship within 60 days after receipt from the obligee of notice of default or demand for payment, and upon a finding that such refusal was in bad faith, the surety shall be liable to pay such obligee, in addition to the loss, not more than 25 percent of the liability of the surety for the loss and all reasonable attorney's fees for the prosecution of the case against the surety." OCGA § 10-7-30 (b). That statute is virtually identical to OCGA § 33-4-6, which deals with the liability of insurance companies on their insurance contracts. *Columbus Fire &c. Co. v. Am. Druggist Ins. Co.,* 166 Ga. App. 509, 510 (304 SE2d 471) (1983). The question of bad faith under the insurance statute is for the jury unless it can be said as a matter of law there was a reasonable defense which vindicates the insurer's good faith. *St. Paul Fire &c. Ins. Co. v. Snitzer,* 183 Ga. App. 395 (2) (358 SE2d 925) (1987).

The statutory 60-day waiting period was satisfied. Compare *Columbus Fire,* supra. Evidence of Wausau's refusal to participate in ascertaining the cause of the problem and its failure to investigate the claim was sufficient to raise a jury question as to its liability for statutory damages and attorney fees. See generally *Central Manufacturers Mut. Ins. Co. v. Graham,* 24 Ga. App. 199 (99 SE 434) (1919); *Progressive Cas. Ins. Co. v. Avery,* 165 Ga. App. 703 (1) (302 SE2d 605) (1983). It was error to direct a verdict on the claim for damages pursuant to OCGA § 10-7-30.

8. Plaintiff contends that the trial court erred in excluding certain hearsay statements made by two alleged agents of K-C. The proponent of hearsay evidence of an agent's admissions must show that the individual was an agent acting within the scope of his authority at the time the statements were made. *Seaboard Coastline R. Co. v. Carter,* 226 Ga. 825 (2) (177 SE2d 683) (1970). Although agency may be shown by the sworn testimony of the alleged agent, *Terminal Trans. Co. v. Decatur Truck &c. Co.,* 90 Ga. App. 859 (84 SE2d 494) (1954), it may not be shown by his out-of-court statements alone. *Colt Co. v. Wheeler,* 31 Ga. App. 427 (5) (120 SE 792) (1923); *Mullis v. Merit Fin. Co. of Savannah,* 116 Ga. App. 582 (158 SE2d 415) (1967). Some of the statements at issue here were allegedly made by K-C's former project manager both orally and in the minutes of the two February meetings, to the effect that K-C used defective materials. Plaintiff has not directed the court's attention to any sworn evidence that the declarant was K-C's agent at the time the statements were made or that he was acting within the scope of his authority. His hearsay statements were properly excluded. *Amicalola Marble &c. Co. v. Coker,* 111 Ga. 872 (2) (36 SE 950) (1900). Likewise, there was no showing of agency or apparent agency so as to render admissible as an admission against interest certain statements attributable to K-C's insurance agent. The only evidence was that he was an independent

contractor.

Since the minutes contained hearsay opinions and conclusions concerning the cause of the leaks, they were not admissible under the business record exception. *Luke v. Spicer,* 194 Ga. App. 183 (2) (390 SE2d 267) (1990).

Correspondence from plaintiff's former attorney, written within the context of good faith negotiations, was properly excluded. OCGA § 24-3-37.

9. Plaintiff requested a jury instruction in the language of *Norair Eng. Corp. v. St. Joseph's Hosp.,* 147 Ga. App. 595, 602 (3) (249 SE2d 642) (1978), as follows: "[The provision of the subcontract requiring K-C to correct defects within one year of acceptance of the project] . . . is an added guarantee, inserted in the contract to extend rather than limit [K-C's] liability for faulty construction. As such, it [is] not [plaintiff's] exclusive remedy, and it in no way impairs [K-C's] general obligation to perform his contract in a proper, workmanlike manner."

The trial court refused to give the requested charge, stating that the legal principle contained therein would be covered in the general charge. It was not. The request contained a correct statement of law and was adjusted to the evidence. The objection was properly preserved. Failure to give the requested charge on a critical legal theory of recovery constituted substantial error and was harmful as a matter of law. OCGA § 5-5-24 (c); *Fowler v. Gorrell,* 148 Ga. App. 573, 577 (2) (251 SE2d 819) (1978).

10. It was likewise error to refuse to give plaintiff's request to charge on the law of indemnification obligations.

K-C was required under the subcontract to indemnify plaintiff against any claim asserted by Embassy Suites involving sufficiency of the subcontractor's work, and for the reasons stated in Division 4 supra, the issue of Wausau's obligation to indemnify its principal should have been presented to the jury. Although the court instructed the jury concerning the legal liability of the indemnitor, that charge was confusing and could have misled a jury of ordinary capacity and understanding. See generally *King Cotton, Ltd. v. Powers,* 190 Ga. App. 845 (2) (380 SE2d 481) (1989). An instruction as requested by plaintiff was mandated. *Fowler v. Gorrell,* supra.

11. Any error in the court's refusal to charge on the meaning of a "design-build" contract was rendered harmless by the admission of the subcontract and other included contract documents which fully described K-C's obligations to design, purchase and install the waste water riser system. A further definition of the concept was provided by the testimony of a design build mechanical contractor.

*Judgment reversed. Carley, P. J., and Johnson, J., concur.*

Decided March 18, 1992 —
Reconsideration denied April 1, 1992 —

*Griffin, Cochrane & Marshall, Jennifer W. Fletcher, Peter H. Strott*, for appellant.

*Webb, Carlock, Copeland, Semler & Stair, Kent T. Stair, Lisa M. Smith, Smith & Fleming, George D. Wenick, Robert O. Fleming, Jr.*, for appellees.