## A89A0546, A89A0547. STRATTON INDUSTRIES, INC. v. NORTHWEST GEORGIA BANK; and vice versa.

(382 SE2d 721)

SOGNIER, Judge.

Northwest Georgia Bank (the Bank) brought suit against Printaire Systems, Inc. to obtain a writ of possession for certain carpet dyeing equipment pledged by Printaire as collateral for a loan obtained from the Bank to fund development and manufacture of the equipment. The system had been ordered from Printaire by Stratton Industries, Inc., a carpet manufacturer, and installed at Stratton's facilities. Stratton moved to intervene in the action filed by the Bank, and its motion was granted. The Bank then asserted claims against Stratton for the unpaid balance of the purchase price, and for damages under various theories. After the close of the evidence at trial, the trial court denied the Bank's motion for a directed verdict on the issue of Stratton's liability for the full amount of the purchase price based on its acceptance of the equipment. The jury returned a verdict for the Bank for $191,000 plus prejudgment interest as damages for the decline in value attributable to Stratton's delay in returning, disposing of, and dismantling the equipment. Judgment was entered thereon and Stratton appeals. The Bank cross-appeals from the trial court's denial of its motion for directed verdict.

The record reveals that the equipment was the machinery and parts for an innovative method of dyeing carpet using air pressure to force dye foam into the carpet's pile. It was hoped that the new process would result in dramatic savings in dyes, chemicals, and energy costs. The system consisted of a twelve foot dye head and vertical and horizontal steamers, as well as various other parts and related accessories. The purchase price for the entire system was $581,500. Stratton made a downpayment of $181,000 with its purchase order, which was executed on April 18, 1980 with the balance due in installments, the final installment being due on or before January 2, 1981, when the equipment was to have been fully installed and functional. In connection with the purchase order, Printaire also executed a performance agreement, signed by Herman Caldwell, its president, which provided that if the equipment failed to perform as agreed Printaire would refund the downpayment and remove the equipment. On July 15, 1980,

three months after Stratton executed the purchase order, the Bank made the first of its loans to Printaire, which in turn executed the first of two security agreements to the Bank, granting the Bank a security interest in the equipment it was developing. In March 1981 Printaire also assigned to the Bank all its accounts receivable, including that of Stratton, and Caldwell personally guaranteed Printaire's notes to the Bank.

The equipment was installed late and testing began in July 1981 and continued for some months thereafter. Because they were unable to resolve certain persistent problems in the operation of the system, by various letters of agreement Stratton and Printaire repeatedly extended the deadline they had set for proper performance of the equipment, with the final extended deadline being June 15, 1982. However, before reaching that final deadline, in May 1982, Printaire ceased operations and Cherokee Machinery, the company actually constructing the machinery for Printaire, filed for protection from its creditors under the bankruptcy laws. The Bank then commenced efforts to gain possession of the collateral or otherwise secure payment of the Printaire loans.

After complex negotiations among Stratton, the Bank, and Caldwell fell through, Burton M. Gold, Stratton's chief executive officer, sent separate but identical letters to Carl Griggs and Caldwell, two of the three principals in Printaire (the third had left the country), dated February 15, 1983, in which Stratton unequivocally rejected the equipment and demanded a refund of all monies paid. In the letter, Gold alleged that Stratton had paid $193,698.35 under the purchase order and was thus owed that sum by Printaire under the performance agreement. The letter stated that "[a]s this equipment has not proven to be satisfactory, Stratton hereby requests a prompt full refund . . . and the subsequent removal of the equipment from its Main Plant . . . ." No response was received to the letter, and the equipment remained at Stratton's facility for the next nine months in virtually the same condition.

In November 1983, Stratton began efforts to modify the Printaire equipment, other than the dye head, so that at least portions of it, including the steamers, might be made to work with a dye head ordered from another manufacturer. Finally, Stratton dismantled the equipment, using neither the dye head nor the steamers manufactured by Cherokee for Printaire, but incorporating certain other minor portions of the equipment into a new dyeing system. The remainder of the equipment was stored. In 1987, long after Stratton had intervened in this action, Stratton advised the Bank that it would no longer store the remaining unused portions of the original equipment, and after advising the Bank that it would do so, removed and retained some other parts of the system and returned the rest to the

Bank. After storing the returned equipment briefly, the Bank sold it for $5,000.

1. We first consider the cross-appeal, in which the Bank asserts that as a matter of law Stratton accepted the equipment because Stratton's actions in modifying the equipment, dismantling it improperly, and using parts of it constituted acts inconsistent with Printaire's ownership, and thus the trial court erred by denying its motion for a directed verdict on that issue. Noting that OCGA § 11-2-606 (1) (c) provides that despite an attempt at rejection "[a]cceptance of goods occurs when the buyer . . . [d]oes any act inconsistent with the seller's ownership," the Bank argues that retention and use or modification of goods have been held to be such acts as are inconsistent with the seller's ownership, citing *W. M. Hobbs, Ltd. v. Accusystems of Ga.*, 177 Ga. App. 432 (339 SE2d 646) (1986), and *Fiat Auto U. S. A. v. Hollums*, 185 Ga. App. 113 (363 SE2d 312) (1987). These abstract principles of law, although otherwise correct, are inapplicable here. In both *W. M. Hobbs* and *Hollums* the purchasers were dealing with already manufactured goods bought from dealers who remained in business and could have been contacted had the purchasers actually desired to return the goods. Instead, those purchasers, while notifying the sellers of their desire to reject the goods, also continued to use the goods.

In the case sub judice, the record reveals that the equipment was not in existence when ordered by Stratton. There is no dispute that the equipment being developed was new and revolutionary in the field of carpet dyeing. It is also uncontroverted that Stratton had paid some $193,000 toward the purchase of the equipment, that the equipment did not function satisfactorily, and that Stratton waited 9 months for Printaire (or the Bank) to respond appropriately to its letters of rejection before attempting to take some action to salvage its investment.

Although the Bank argues that it sought to recover the equipment and was refused by Stratton, and although the record reveals that negotiations took place between Stratton and the Bank with *a view* toward returning at least portions of the equipment and crediting Stratton with the amount it had paid for the nonfunctioning equipment as part payment for some other parts, the record reveals no offer by the Bank, as Printaire's assignee, to refund Stratton's downpayment. On the contrary, the evidence shows that in February 1983, Stratton made an absolutely unequivocal demand that Printaire remove the equipment and refund Stratton's money, to which the Bank, although aware of Stratton's February 1983 letter, made no response.

" 'In reviewing the overruling of a motion for a directed verdict, the proper standard to be utilized by the appellate court is the "any

evidence" test. (Cits.)' [Cit.]" *Summerour v. St. Joseph's Infirmary*, 160 Ga. App. 187, 188 (286 SE2d 508) (1981). Under the circumstances presented here, viewing the evidence in the light most favorable to Stratton, as required, see *Concrete Constr. Co. v. Atlanta*, 176 Ga. App. 873, 874 (2) (339 SE2d 266) (1985), we find some evidence existed that Stratton's actions after its unequivocal rejection (i.e., modifying, altering, and using parts of the equipment) were undertaken to protect the investment it had made which, in view of Printaire having ceased operations and the lack of response to its letters, Stratton felt it had little hope of recovering. Thus, there existed a fact question to be determined by the jury as to whether Stratton's actions constituted acts inconsistent with Printaire's ownership. The jury was instructed in that regard and returned a verdict which indicates the jury did not find an acceptance. Accordingly, the trial court did not err by denying the Bank's motion for directed verdict. See generally *Scott v. Hussmann Refrigeration*, 183 Ga. App. 39, 40 (1) (357 SE2d 860) (1987).

2. Turning to the main appeal, Stratton contends the trial court erred by awarding prejudgment interest on the verdict because the jury awarded damages on a tort theory, and because the claim was unliquidated. We do not agree with either argument made by Stratton, and affirm the award of prejudgment interest.

(a) The verdict form alternative chosen by the jury awarded damages to the Bank "for the decline in value attributable to [Stratton's] delay in returning, disposing of and dismantling the [e]quipment." The wording of this alternative embraced three different theories of recovery against Stratton offered by the Bank at trial: conversion and tortious interference with its contract with Printaire, both of which sound in tort, and a failure to comply with the UCC, which sounds in contract. See generally *UIV Corp. v. Oswald*, 139 Ga. App. 697, 700 (229 SE2d 512) (1976). The jury was instructed that should they award damages to the Bank, if their award was based on either of the tort theories, punitive damages were awardable, but if their award was based on breach of contract, prejudgment interest could be awarded "at the rate of twelve percent from the time of breach until the time of recovery." The jury returned a verdict which included 12 percent interest from November 1983.

" 'The verdict may be construed in the light of the pleadings, the issues made by the evidence and the charge. (Cits.) . . . The presumptions are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. (Cit.) Even if the verdict is ambiguous . . . and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied. (Cit.)' [Cit.]" *West Ga. Pulpwood v. Stephens*, 128 Ga. App. 864, 870 (198 SE2d 420) (1973). See also

*Rucker v. Camden Tel. &c. Co.*, 181 Ga. App. 504, 505 (353 SE2d 50) (1987). Thus, if possible, we must construe the verdict as based on the Bank's contract theory, because only that theory allows us to uphold the jury's verdict in its entirety, including the award of interest.

Although we have found in Division 1, supra, that Stratton did not accept the equipment, and thus is not liable for the entire purchase price, nevertheless it may be liable in damages to the Bank because its retention of the equipment as security for the return of its downpayment placed it in the relationship of a secured creditor vis-a-vis Printaire (and its assignee, the Bank), and made it subject to the requirement in OCGA § 11-9-504 that it treat the equipment in a commercially reasonable manner.

Evidence was presented at trial which was sufficient to authorize the jury to conclude that Stratton's treatment of the equipment was not commercially reasonable, thus exposing Stratton to liability for damages for the equipment's decline in value. Accordingly, we presume the jury's verdict was based on Stratton's breach of its duty under the UCC, *West Ga. Pulpwood*, supra, and affirm the award of prejudgment interest.

(b) OCGA § 13-6-13 provides that "[i]n all cases where an amount ascertained would be the damages at the time of the breach, it may be increased by the addition of legal interest from that time until the recovery." In *Norair Engineering Corp. v. St. Joseph's Hosp.*, 147 Ga. App. 595, 604-606 (6) (249 SE2d 642) (1978), this court held that prejudgment interest may be awarded in a contract case. In *Braner v. Southern Trust Ins. Co.*, 255 Ga. 117, 119 (335 SE2d 547) (1985), the Supreme Court held that a jury in its discretion may make a separate award of interest in contract cases even where the damages are not liquidated. See also *Typo-Repro Svcs. v. Bishop*, 188 Ga. App. 576, 579-580 (2) (373 SE2d 758) (1988). Hence, the award of interest was entirely proper.

(c) Stratton failed to object to the court's charge instructing the jury that it could award 12 percent interest from the date of a breach of contract, and thus it cannot now complain that the rate is improper. See generally *Financial Bldg. &c. v. St. Charles &c. Co.*, 145 Ga. App. 768, 771 (3) (244 SE2d 877) (1978).

3. Finally, Stratton contends the trial court erred by finding as a matter of law that the Bank had a security interest in all of the equipment because the security agreements between the Bank and Printaire do not specifically list the steamers as part of the collateral. We find no merit in this contention.

First, we find the language of the security agreements giving the Bank an interest in all the equipment clear and unambiguous. Although the 1980 security agreement does not specifically list the steamers, the document does convey a security interest in a dye head

"[c]omprised of: [various listed items] and on the ancilliary (sic) equipment." The contract language fails to support Stratton's argument that the ancillary equipment is one of the items of which the dye head is comprised. Rather, the language plainly indicates that the document conveys a security interest both in the dye head and its components and *also* in the ancillary equipment, which obviously includes the necessary steamers.

Stratton's contention also overlooks the language in the security agreement giving a security interest in "the following described property *together with all accessions thereto.*" (Emphasis supplied.) OCGA § 11-9-314 defines accessions as goods which are "installed in or affixed to other goods." Accessions have also been defined as "goods of such a nature as to form an 'integral part' of the [whole] 'and are so attached to it, that (they) are one and the same thing under the accession rule.' [Cits.]" *Glenn v. Trust Co. of Columbus*, 152 Ga. App. 314, 317 (262 SE2d 590) (1979). The steamers were affixed to and installed in the system and the system was sold as one integrated whole. Thus, the steamers would be included in the collateral as accessions even if they were not included elsewhere in the description.

Similarly, contrary to Stratton's argument, we find the language in the 1981 security agreement is clear in including the steamers in the description of the collateral, which includes "the following described property together with all accessions thereto[:] 1 - 12 Foot CFD II Printaire Foam Dye Carpet Dying (sic) Machine with Manufacturer's ID # A-80-003 located at Stratton Industries, Inc.," since that description includes not only the dye head, but the entire system, including the steamers, which comprises the "Carpet Dy[e]ing Machine."

Second, however, even if the language in the security agreement were to require construction, "[t]he proper construction of a written contract is generally a question of law for the court. [Cit.]" *Shore v. Loomis*, 187 Ga. App. 674, 675 (1) (371 SE2d 96) (1988). " 'The existence or non-existence of ambiguity is always a question of law for the court, [cit.]' [cit.]," *Stover & Sons, Inc. v. Harry Norman, Inc.*, 187 Ga. App. 514, 515-516 (2) (370 SE2d 776) (1988), and " '[t]he cardinal rule of construction (of a contract) is to ascertain the intention of the parties.' [Cit.]" *Giddens Constr. Co. v. Fickling & Walker Co.*, 188 Ga. App. 558 (2) (373 SE2d 792) (1988). Caldwell testified that "[a]ncillary equipment is everything that goes with the dye head, the dye head being the primary part of the system and everything else is ancillary to that, that was included with that purchase order," and that was what he understood Printaire was assigning to the Bank. Moreover, both Wesley Smith, the Bank's president, and Caldwell testified that it was the understanding between the Bank and

Printaire that the Bank agreed to make the loan to Printaire upon the condition that the Bank would have a security interest in all the equipment being fabricated, and both principals testified that it was the parties' intention that the steamers be included in the collateral. Therefore, any ambiguity in the contract as to the inclusion of the steamers in the collateral was eliminated by the use of principles of contract construction to ascertain the intention of the parties, and the trial court was authorized to find that the Bank had a security interest in all the collateral, including the steamers. See *Shore*, supra at 675 (1).

*Judgment affirmed. Banke, P. J., and Pope, J., concur.*

DECIDED MAY 25, 1989.

*Alston & Bird, W. Terence Walsh, Donna P. Bergeson*, for appellant.

*Hansell & Post, R. Matthew Martin, Clifton M. Patty, Jr.*, for appellee.