A09A1753. JTH TAX, INC. v. FLOWERS.
(691 SE2d 637)

SMITH, Presiding Judge.

JTH Tax, Inc. d/b/a Liberty Tax Service ("Liberty Tax") appeals from a jury verdict in favor of Joan Flowers in this dispute arising from Flowers's sale of a tax preparation business to Liberty Tax. Liberty Tax asserts the trial court erred by denying its motion for a judgment notwithstanding the verdict (j.n.o.v.) on Flowers's claims for fraud, punitive damages, and attorney fees. For the reasons set forth below, we affirm the jury's verdict.

> On appeal from a trial court's rulings on motions for directed verdict and j.n.o.v., we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments n.o.v. are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Citation and footnote omitted.) *James E. Warren, M.D., P.C. v. Weber*

---

*& Warren Anesthesia Svcs.*, 272 Ga. App. 232, 235 (2) (612 SE2d 17) (2005).

So viewed, the record shows that Flowers sold her tax preparation business to Liberty Tax and that the sale contract provided:

> The Purchase Price shall be the lesser of (a) $145,240 ("2000 Revenue") [or] (b) Purchaser's gross receipts for the period of January 1, 2001 to December 31, 2001 generated from all sources and from the current location of the Seller combined with subsequent location(s) if applicable (the "2001 Revenue").

With regard to payment of the purchase price, the contract provided: "The first payment shall be made on February 28, 2001 and shall equal the lesser of one-fourth of 2000 Revenue or one-fourth of 2001 Revenue as estimated at that time." The remaining one-fourth payments were to be paid on February 28 of the following consecutive years (2002, 2003, and 2004). Finally, the contract stated, "All payments shall include interest on the unpaid Purchase Price, computed at an annual rate of 9.5%."

A previous letter of intent between the parties contained a different formula for calculating the purchase price: "the lesser of one times 1) Liberty's revenue from all sources for the year 2001 at this location (or combined with its subsequent location if the business is relocated), or 2) [seller's] revenue for the year 2000." The final sales contract was drafted by the director of Liberty Tax's business development department, Raymond Dunn. Dunn testified that he was not an attorney and that his intent was to draft a contract "to reflect what was agreed to in the letter of intent." He could not "give . . . a specific reason" to explain why the purchase price language in the contract differed from the letter of intent language.

Flowers testified that she thought she would receive $145,240 for the sale of her business because Liberty Tax "had such a big marketing program and they were going to grow [her] business." She also testified that Liberty Tax should have generated more income in 2001 than she did in 2000 because she had to turn down some appointments in 2000 when she was sick in January, when she broke a leg in August, and when she spent time preparing to sell the business. Additionally, she testified that she started her business in 1982, that she began renting an office for a "full year in 1991," and that her business grew larger every year.

The same day that Liberty Tax purchased Flowers's business, it sold the business to a franchisee, Mary Ann Babb, who already owned another Liberty Tax franchise in Riverdale, Georgia. Babb's

contract with Liberty Tax contained a sale price formula that was the mirror image of the contract between Liberty Tax and Flowers.[1] Babb's Riverdale store was purchased in late 1999, and its performance the first year "was not as good as it was the year" before the purchase. "Although it was not a bad year, it was not up to expectations." Babb purchased the Riverdale Liberty Tax location for "a flat dollar amount based on the previous year's sales." When Babb purchased the Stockbridge store, her husband, who managed the business,

> made it clear that . . . [the purchase price] would have to be conditioned on the dollar amount that we received. I didn't mind a minimum or suggested price, but at the end of the tax season or at the end of the year, the purchase price had to be equal or in some relationship to the dollars that we received that year. It couldn't just be a blanket price.

On February 28, 2001, Liberty sent Flowers a letter estimating that the 2001 gross revenues for the business would be $60,000 and including a payment of $16,311.78. Flowers protested the payment as "short" and hired an attorney.

In a letter sent July 24, 2001, Flowers's attorney wrote that the contract "clearly provides that the purchase price will be the 2001 revenue of [the business] plus the entire gross receipts of JTH Tax, Inc. or $145,240, whichever is less" and explained that the February payment should have been $39,484.72. The lawyer also sent two follow-up letters on August 14 and 30, 2001. On September 6, 2001, corporate counsel for Liberty Tax responded:

> I am in receipt of your letter of August 30, 2001 wherein you reiterate a request for certain Liberty Tax income records. Would you please kindly point me to the specific clause or paragraph in our agreement with Joan Flowers which gives her the right to those particular records so that I may further evaluate this request.

Flowers's counsel then replied:

> We believe that [it is] implied within the sales agreement that you would make an accurate accounting of 2001 gross

---

[1] The purchase price ("Purchase Price") to be paid by the Purchaser to the Seller for the Business shall be the lesser of (a) $145,240, or (b) Purchaser's gross receipts for the period of January 1, 2001 to December 31, 2001 generated from all sources and from the Current Location combined with subsequent location(s), if applicable (the "2001 Revenue").

revenue and that Ms. Flowers would not be required to take your and your purchasers' word for the 2001 revenue. Additionally, if Ms. Flowers could see the names and charges for the 2001 customers, it might ease her fears that customers were not pursued.

On September 25, 2001, Liberty Tax repeated its refusal to provide documentation to Flowers's counsel, citing IRS confidentiality regulations. Before suit, Liberty Tax never produced any documentation supporting its 2001 gross revenue estimate that was less than half the business's 2000 gross revenues.

In February 2002, Liberty Tax sent Flowers a Purchase Allocation Report indicating a 2001 year end gross revenue total of $60,445 and a check totaling $19,518.08. The report indicated zero receipts for the months of October, November, and December. The Liberty Tax representative who prepared the report testified that these numbers did not cause her any alarm because "in our industry there is quite often no volume done between October and . . . December."

Flowers presented testimony showing that she referred a former customer to the Liberty Tax franchisee and that this customer paid the franchisee $1,707 on October 15, 2001. In May 2002, Flowers notified Liberty Tax about this payment and questioned why it was showing no income for the month of October. She received no response.

After receiving a final payment in 2004 based upon a 2001 gross revenue calculation of $60,000, Flowers felt compelled to file a lawsuit "because they wouldn't answer my questions or give me any information." After the lawsuit was filed, Liberty generated another report in December 2005 showing additional revenue of $3,365 for the month of October 2001 and sent Flowers another check.

At trial, an expert testified on behalf of Flowers that the documents he reviewed demonstrated that Liberty "was managing to a target"[2] number of $60,000 in gross revenue based upon the statement in the February 28, 2001 letter that the estimated gross revenues for the business in 2001 was $60,000. He explained that it was "either very good forecasting or removing things from the activities of the business that were not consistent with that. To hit $60,000 on the nose is, in my opinion, highly suspicious." The expert explained that the estimate was made "with more than half of the business season still to go and all the follow-along work with extensions. So that estimate is based on very limited information." Flowers also submitted evidence showing a July 2001 check that

---

[2] The expert agreed that "managing to a target" can be another way of saying "cooking the books."

Liberty failed to include in its gross revenue calculation and showing that former customers of Flowers's business in Stockbridge ended up on a customer list for Babb's Riverdale Liberty Tax location.

Flowers presented evidence that she was entitled to a total of $155,321 based upon the contract price of $145,240, plus interest. Flowers did not present any evidence demonstrating that her former business actually earned more in 2001 than it did in 2000. Instead, the only specific evidence before the jury showed that it earned $63,809.50 in 2001. Liberty Tax explained that it did not initially know about the October 2001 earnings because its franchisee failed to "lock" and transmit the gross receipt data for that time period to Liberty Tax. During closing arguments, Liberty Tax acknowledged that it made "a $3,600 error" in calculating the business's 2001 income.

Following a four-day trial, the jury awarded Flowers $155,311.24 in damages for breach of contract, $63,809.50 in damages for fraud, $110,078.16 in attorney fees, and $420,801.10 in punitive damages for a total award of $750,000. Flowers moved to amend the verdict, and the trial court granted her request to reduce the contract damages by the amount of the fraud award to prevent a double recovery of compensatory damages. Liberty Tax does not assert in this appeal that the trial court erred by granting this request.

1. Liberty Tax asserts that it was entitled to a j.n.o.v. on Flowers's fraud claim because she failed to prove that she suffered any actual damages as a result of its alleged fraud. We disagree.

"To establish a cause of action for fraud, a plaintiff must show that actual damages, not simply nominal damages, flowed from the fraud alleged. [Cits.]" *Glynn County Fed. Employees Credit Union v. Peagler*, 256 Ga. 342, 344 (2) (348 SE2d 628) (1986). "Falsehood, or in the plainer language of some of the authorities, a lie, without damage, will not entitle the plaintiff to recover." (Citation and punctuation omitted.) *Reynolds v. Flint River Technical Institute*, 223 Ga. App. 240, 242 (477 SE2d 393) (1996).

> Where a party sues for damages he has the burden of showing the amount of the loss in a manner in which the jury or the trial judge in a non-jury case can calculate the amount of the loss with a reasonable degree of certainty. The question of damages cannot be left to speculation, conjecture and guesswork.

(Citations and punctuation omitted.) *Stovall Tire &c. v. Prance Body &c. Works*, 179 Ga. App. 483, 484 (347 SE2d 313) (1986).

In the case before us, the contract could be interpreted to provide that the purchase price would be either Flowers's gross

revenue from 2000 or the gross revenue of all Liberty Tax's stores in 2001, whichever was less.[3] The record established without dispute that the gross revenue from all of Liberty Tax's stores exceeded the 2000 revenue of $145,240. Under this contract interpretation, Flowers was entitled to the $145,240 sale price, plus interest, as awarded by the jury, and she was not damaged by any fraud on the part of Liberty Tax with regard to the earnings of her former business in 2001.

If, however, the contract was interpreted to mean that the purchase price was the lesser number of her business's 2000 or 2001 gross revenue, the analysis is different. The evidence before the jury showed that Flowers's former business actually earned $63,809.50 and that Liberty Tax failed to report $3,365 in income to Flowers. Under this contract interpretation, Flowers showed, at a minimum, $3,365 in actual damages. The jury was also presented with circumstantial evidence supporting an inference that her well-established business should have earned more in 2001 than in 2000. Cf *Mizell v. Spires*, 146 Ga. App. 330 (246 SE2d 385) (1978) (affirming jury award of lost profits to established business "even though they cannot be computed with exact mathematical certainty").

Because we cannot determine from the jury's verdict which contract interpretation it adopted and are required to construe the verdict to uphold it, *Stratton Indus. v. Northwest Ga. Bank*, 191 Ga. App. 683, 687 (2) (a) (382 SE2d 721) (1989), we must conclude that Flowers presented evidence of actual damages in support of her fraud claim.

2. Liberty Tax asserts that it was also entitled to a j.n.o.v. with regard to Flowers's fraud claim because she presented no facts demonstrating that she relied upon any of its alleged misrepresentations. In support of this assertion, Liberty Tax argues:

> Ms. Flowers claimed that, after closing, Liberty repeatedly misrepresented to her the amount of business conducted at the Stockbridge location in 2001 and, therefore, the amount due to her under the Purchase and Sale Agreement. However, Ms. Flowers consistently has claimed that she was entitled to a set payment of $145,240 as the "lesser amount" under the parties' agreement, no matter what. By Ms. Flowers'[s] admission, she refused to rely upon anything Liberty said about the business conducted at the Stockbridge location.

---

[3] Although Liberty Tax asserted a counterclaim to reform the contract to reflect the intent of the parties, it withdrew this claim during trial.

Liberty Tax also points out that Flowers cashed its checks under protest and hired an attorney to dispute its calculations.

Flowers responds that she "relied upon [Liberty Tax] to properly report the Stockbridge revenue for 2001 and further relied upon [Liberty Tax] to properly pay [the] bargained for price pursuant to the agreement." She also asserts that she relied upon Liberty's representations in the inducement of the contract.[4]

(a) We find that Flowers failed to present any evidence demonstrating that she relied upon Liberty Tax's misrepresentations about the amount of money actually earned by her former business in 2001. The facts of this case are similar to those presented in *Parsells v. Orkin Exterminating Co.*, 172 Ga. App. 74 (322 SE2d 91) (1984), where we held that the defendant's alleged attempt to deceive the plaintiff "obviously failed" because the plaintiff "did not accept" the alleged misrepresentation and filed suit shortly thereafter. Id. at 76.

(b) Flowers asserts in the alternative that she can demonstrate reliance upon a different alleged misrepresentation by Liberty. According to Flowers, she was fraudulently induced to enter into the sale contract with Liberty Tax based upon its misrepresentations that it would actually pay her the amount owed under the contract. In other words, Liberty Tax "had no present intent to perform at the time the agreement was executed."

> In most circumstances, actionable fraud cannot be predicated on a promise contained in a contract because fraud generally cannot be predicated on statements that are in the nature of promises as to future events, and to hold otherwise, any breach of a contract would amount to fraud. However, an exception to this rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place.

(Citations, punctuation and footnotes omitted.) *TechBios v. Champagne*, 301 Ga. App. 592, 594 (1) (a) (688 SE2d 378) (2009). "Fraudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith. [Cits.]" *BTL COM Ltd. v. Vachon*, 278 Ga. App. 256, 261 (1) (628 SE2d 690) (2006).

---

[4] Flowers did not seek to rescind the contract as a result of Liberty Tax's alleged fraud. Instead, she affirmed the contract and sought money damages for breach of contract and fraud. See *Megel v. Donaldson*, 288 Ga. App. 510, 515 (3) (654 SE2d 656) (2007).

In this case, we must affirm the jury's finding of fraud because Flowers presented some evidence showing that Liberty Tax's subsequent conduct demonstrated fraudulent intent. *BTL COM*, supra, 278 Ga. App. at 261 (1); *Gunnin v. Dement*, 205 Ga. App. 631, 633-634 (2) (422 SE2d 893) (1992). "Fraud may be proved by slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question." (Citations and punctuation omitted.) *BTL COM*, supra, 278 Ga. App. at 261 (1). Our opinion in *Pacrim Assoc. v. Turner Home Entertainment*, 235 Ga. App. 761 (510 SE2d 52) (1998), does not require a different result. As we have previously recognized, "[i]n that case, unlike here, there was no evidence of conduct by the defendant after the contract was made that was unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith." *BTL COM*, supra, 278 Ga. App. at 263 (2).

3. Liberty Tax's remaining enumerations of error with regard to punitive damages and attorney fees are rendered moot by our holding in Division 2 (b) with regard to Flowers's fraud claim. *FitzSimons v. W. M. Collins Enterprises*, 271 Ga. App. 854, 857-858 (3), (4) (610 SE2d 654) (2005); OCGA § 13-6-11.

*Judgment affirmed. Phipps and Bernes, JJ., concur.*

DECIDED MARCH 9, 2010 — ▮

*Smith, Gambrell & Russell, Edward H. Wasmuth, Jr.*, for appellant.

*Smith, Welch & Brittain, John P. Webb, Andrew J. Gebhardt*, for appellee.