**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 19, 2017**

# In the Court of Appeals of Georgia

A17A1103. SURE, INC. v. PREMIER PETROLEUM, INC.

MCMILLIAN, Judge.

Sure, Inc. ("Sure") appeals from the trial court's grant of summary judgment on its claims against Premier Petroleum, Inc. ("Premier") arising out of a petroleum supply contract and loan documents executed by the parties. For the reasons set forth below, we reverse the trial court's grant of summary judgment on Sure's claim for breach of contract, affirm the grant of summary judgment on Sure's claim for wrongful foreclosure, and affirm in part and reverse in part the grant of summary judgment on Sure's claim of fraud.

It is well settled that

[s]ummary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the

grant of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

So viewed, the evidence of record shows that at the pertinent time, Sure owned and operated a convenience store and gas station in Suwanee, Georgia (the "Station"). Natt Nwokolo is the president, secretary, and majority shareholder of Sure.[1] Premier is a Georgia petroleum supplier/distributor, and Aziz Dhanani is its president. Premier conducts its business by purchasing gasoline from a branded oil company at wholesale and then providing the gasoline to various retail gas stations and convenience stores.

*Supply Agreement*

In December 2009, Nwokolo decided to rebrand the Station from a CITGO to a Shell Oil station. In conjunction with that decision, Nwokolo spoke with representatives of Premier, and on December 11, 2009, Sure and Premier entered into

---

[1] Nwokolo testified in his February 2016 deposition that he was the sole shareholder of Sure, but he averred in his October 2016 affidavit that he was the "majority shareholder."

2

a Contract Supply Agreement (the "Supply Agreement"), which provided that Premier would be the exclusive supplier of petroleum products to the Station and that Sure would purchase a minimum of 60,000 gallons of such products per month.

Under the terms of the Supply Agreement, Premier agreed to assist Sure by processing its credit card payments, and Sure was required to pay for gasoline deliveries at the time of delivery. Additionally, Premier agreed to pay Sure a rebate of $.02 per gallon for a period of three years beginning after the Station was completely rebranded and accepted by Shell.

*Loan from Premier to Sure*

Certain renovations were required as part of the re-branding of the Station, and Nwokolo also decided to update the Station's gas pumps. Premier agreed to lend Sure money to help accomplish these changes (the "Loan"), and the parties executed loan documents, including a $56,000 promissory note (the "Note") and a "Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement" (the "Deed to Secure Debt"), both signed by Sure, as well as a personal guaranty signed by Nwokolo. The Deed to Secure Debt granted Premier a security interest in a one-acre lot owned by Sure adjacent to the Station (the "Adjacent Property").

At or around the time of the closing on the Loan, Premier issued a check dated January 28, 2010, in the amount of $6,000 to Sure. Then, on February 8, 2010, Premier issued a check on behalf of Sure in the amount of $14,000 to a third-party, B & B Petroleum System Services, Inc. ("B&B"), toward the replacement or refurbishment of the gasoline pumps. Although Premier produced written documentation showing Nwokolo's authorization for Premier to pay $50,000 of the Loan proceeds to B & B (the "Authorization"), Nwokolo asserts that he never authorized that any of the Loan proceeds be paid to B&B, he never signed the Authorization, and the signature on that document is a forgery. Rather, he believed that all the Loan proceeds would be paid to Sure directly.

Nwokolo wrote Premier a letter dated February 25, 2010, to inform the company that Sure had decided not to accept the $56,000 Loan, noting that Sure had only received $6,000 of the Loan proceeds as of that date. Nwokolo represented that he had asked B&B, and it had agreed, to refund the $14,000 payment back to Premier, and he stated that he intended to refund the $6,000 paid to Sure. However, the letter was not mailed until March 17, 2010.

Premier responded by letter dated March 19, 2010, noting that the first payment under the Note, due on March 1, 2010, had not been paid. The March 19 letter gave

4

Sure five days in which to pay the $20,000 in Loan proceeds that Premier had paid out. Premier again wrote Nwokolo and Sure on April 14, 2010, to give notice that Sure was in default under the terms of the Note and that the company could cure the default by paying the sum of $4,515.27, representing the outstanding Loan payments for March and April 2010, including interest. Premier next wrote Sure and Nwokolo on October 13, 2010, demanding payment of all amounts due and owing under the Note and informing them that, in the absence of such payment within the next ten days, Premier intended to pursue legal action, including foreclosure under the Deed to Secure Debt. Neither Sure nor Nwokolo has ever returned the $6,000 Sure received in January 2010 nor have they ever paid Premier any amounts under the terms of the Loan documents. Premier subsequently foreclosed on the Adjacent Property, and as the highest bidder at the foreclosure sale, Premier acquired that property (the "Foreclosure").

Despite this Loan dispute, Premier and Sure continued to operate under the terms of the Supply Contract, with Premier continuing to supply Sure with Shell gasoline. At some point, Premier adopted the practice of withholding the credit card payments it was servicing for Sure and netting them against the cost of Sure's gasoline purchases, maintaining a running credit balance on Sure's behalf.

*Bankruptcy Proceedings*

On June 3, 2011, after the Foreclosure, Sure filed for bankruptcy in federal court to stop Premier from proceeding against its business as well. That bankruptcy action was dismissed on September 21, 2012, and Sure was not discharged in that proceeding.

Sure filed a second bankruptcy action on November 5, 2012 (the "Second Bankruptcy Action"). During the course of that proceeding, Sure filed a "Notice of Rejection and Motion to Approve Rejection of the Executory Contract Between Sure, Inc. and Premier Petroleum, Inc." ("Motion to Reject"), seeking to relieve itself of its future obligations under the Supply Agreement, and the bankruptcy court granted that motion, approving Sure's rejection of that agreement on April 29, 2013. Sure subsequently filed a motion in the bankruptcy court to compel Premier to turn over credit card receipts it claimed Premier was wrongfully withholding under the Supply Agreement. The bankruptcy court denied the motion, instead determining that Sure should seek relief in the form of an adversary proceeding. On June 17, 2013, the trustee in the Second Bankruptcy Action filed a motion to dismiss or convert the action on the grounds that Sure had failed to file monthly operating reports as required and had also failed to pay administrative fees that were due and owing. The

6

bankruptcy court granted the trustee's motion and dismissed the Second Bankruptcy Action on October 2, 2013, without granting Sure a discharge.[2]

*Current Lawsuit*

On February 2, 2015, Sure filed the complaint in this action and seeks recovery against Premier for breach of contract, fraud, and wrongful foreclosure. Sure claims it is entitled to recover credit card proceeds that Premier has wrongfully withheld; to recover a $.02 per gallon rebate on the gasoline it purchased from Premier; and to have the foreclosure on the Adjacent Property declared null and void. Premier answered denying liability and moved for summary judgment on Sure's claims.

The trial court granted Premier's motion finding that Sure (1) could not sue Premier for breach of contract because Sure rejected the Supply Agreement in the Second Bankruptcy Action; (2) is judicially estopped from claiming the $.02 per gallon rebate because it never listed this claim as an asset of its bankruptcy estate; (3) is collaterally estopped from re-litigating the issue of any credit card monies because the issue was already decided adversely to Sure in the Second Bankruptcy Action; (4) is not entitled to a claim for wrongful foreclosure because it never paid the monies

---

[2] Additional facts will be discussed as necessary to address the parties' appellate arguments.

7

due and owing under the Note and because it never tendered the amount due; and (5) is not entitled to relief on its fraud claims because it failed to plead fraud with particularity, failed to provide evidence of any false representations by Premier, signed documents containing merger clauses, and failed to provide evidence of reasonable reliance. This appeal followed.

1. *Breach of Contract* – Sure first asserts that the trial court erred in finding that its breach of contract claim is barred by the proceedings in the Second Bankruptcy Action. We agree.

(a) Sure filed its Motion to Reject pursuant to 11 U.S.C. § 365, and the bankruptcy court approved Sure's rejection of the Supply Contract, as an executory contract. Premier argued below, and the trial court found, that Sure's rejection amounted to a rescission or dissolution of the Supply Contract in its entirety, leaving Sure without standing to sue for breach of contract.

It is well settled that "[r]ejection of an executory contract under § 365 of the Bankruptcy Code constitutes a breach and the injured party is entitled to assert a claim based thereon." *Puett v. McCannon*, 183 Ga. App. 152, 154 (1) (358 SE2d 300) (1987). However,

rejection does not embody the contract-vaporizing properties so commonly ascribed to it. Rejection merely frees the [bankruptcy] estate from the obligation to perform; it does not make the contract disappear. More specifically, rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.

(Citations and punctuation omitted.) *Thompkins v. Lil' Joe Records, Inc.*, 476 F3d 1294, 1306 (1) (11th Cir. 2007). Therefore, while rejection under § 365 affects the parties' future performance under an executory contract, it does not affect the provisions of the agreement that have been fully executed. See id. at 1307 (1) (where transfer of artist's copyrights completed at time sales contract executed, such rights did not revert to artist upon purchaser's rejection of the parties' agreement); *Lawrence v. Commonwealth of Kentucky Trans. Cabinet (In re Shelbyville Road Shoppes, LLC)*, 775 F3d 789, 797 (6th Cir. 2015) ("Section 365, including its provision for rejection, addresses only future performance obligations of the parties.") (citation and punctuation omitted); *Murphy v. C & W Ltd. Corp. (In re Murphy)*, 694 F2d 172, 174 (8th Cir.1982). ("[R]ejection of an executory contract . . . is not the equivalent of rescission."); *In re Exec. Technical Data Systems*, 79 BR 276, 282 (Bankr. E.D. Mich. 1987) (A rejection in bankruptcy does not require "the reversal

9

or undoing of already executed provisions" because § 365 "does not have any impact upon the executed portions of a contract.").

Sure asserts two breach of contract claims: (1) for non-payment of the $.02 per gallon rebate and (2) for return of the credit card proceeds it asserts Premier has wrongfully withheld. These claims do not address issues of future performance. Rather, Sure is taking the position that it completely rebranded the station and the rebranding was accepted by Shell and that Premier breached the contract by failing to pay the $.02 rebate during the ensuing three years. We find that the rejection of the Supply Agreement in bankruptcy does not bar such a claim. Likewise, Sure's claim that Premier has wrongfully withheld credit card proceeds, over and above any amounts Sure owed Premier, also relates to an executed portion of the contract. It appears that Premier has processed the credit card sales, and Sure has paid for its gasoline purchases. Sure simply seeks to recover any overages retained by Premier. The rejection in bankruptcy does not bar such a claim.

The case of *Speir v. Nicholson*, 202 Ga. App. 405 (414 SE2d 533) (1992), upon which the trial court relied in holding otherwise, is readily distinguishable. In that case, the parties closed on the sale of a business, which filed for bankruptcy shortly thereafter, before the terms of the sale were completed by either party. The business's

10

assets were never transferred to the purchaser, and the purchaser never completed payment. A third-party beneficiary under the contract sued to compel the purchaser to complete payment for the business assets. However, the bankruptcy trustee had already sold those assets to another buyer, and the *Speir* court found that this action was a repudiation of the contract (equivalent to a formal rejection under § 365) "to the extent that it was executory, thereby discharging the purchasers from further performance" under its terms. 202 Ga. App. at 406-07 (1). Therefore, the *Speir* court's ruling supports our finding that a rejection in bankruptcy affects only future performance. The Court further held, under the facts of that case, that because neither party had completed performance under the contract, there was a failure of its underlying consideration, which barred the third-party beneficiary's claim. Id. at 408 (2). Here, in contrast, Sure contends that it fully performed by completing the rebranding of the station and making payment for gasoline deliveries; therefore, no failure of consideration occurred, and the non-executory provisions of the Supply Agreement remain enforceable. Accordingly, the trial court erred in finding that the rejection in bankruptcy deprived Sure of its claims for breach of contract.

11

(b) Sure also asserts that the trial court erred in finding that its claim for the rebate is judicially estopped by its failure to list the claim in its petition in the Second Bankruptcy. Once again, we agree.

"The federal doctrine of judicial estoppel precludes a party from asserting a position in one judicial proceeding after having successfully asserted a contrary position in a prior proceeding." *Period Homes v. Wallick*, 275 Ga. 486, 488 (2) (569 SE2d 502) (2002). "It is most commonly invoked to prevent bankruptcy debtors from concealing a possible cause of action, asserting the claim following the discharge of the bankruptcy and excluding resources from the bankruptcy estate that might have otherwise satisfied creditors." Id. See also *American Nat. Bank of Jacksonville v. Fed. Deposit Ins. Corp.*, 710 F2d 1528, 1536 (11th Cir.1983) ("The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.") (citation omitted).

Georgia courts consider three factors to determine whether the doctrine bars a claim:

> (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to accept the party's earlier position; . . . absent success in a prior proceeding, a party's later inconsistent position introduces no risk of

12

inconsistent court determinations, and thus poses little threat to judicial integrity; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

(Punctuation omitted.) *IBF Participating Income Fund v. Dillard-Winecoff, LLC*, 275 Ga. 765, 766-67 (573 SE2d 58) (2002).

Applying this authority, we find that the trial court abused its discretion in applying judicial estoppel to bar Sure's rebate claim because the Second Bankruptcy Action was dismissed without a discharge. Our Supreme Court has held that no benefit or unfair advantage arises from a bankruptcy debtor's failure to list a claim when the bankruptcy action ultimately is dismissed prior to a discharge in bankruptcy. *Dillard-Winecoff*, 275 Ga. at 766. See also *Klardie v. Klardie*, 287 Ga. 499, 502 (2) (697 SE2d 207) (2010) (appellate courts review trial court's application of judicial estoppel for an abuse of discretion). As the Court explained, "[t]o hold otherwise would give a windfall to the defendant in [a] state court contract/tort action by dismissing that action without a determination of its merits[.]" *Dillard-Winecoff*, 275 Ga. at 767. Moreover, as in *Dillard-Winecoff*, the defendant in this case apparently has been paid in full. Premier has foreclosed on the Loan collateral and further withheld credit card receipts to net against Sure's gas purchases, and there is no

evidence or assertion that it has not been repaid for what Sure owed. Therefore, we find that "the balance of equities is tipped in favor of permitting" Sure to pursue its rebate claim against Premier. Id.

(c) We also agree with Sure's argument that the trial court erred in finding that Sure's claim for the credit card receipts was barred by collateral estoppel.

"The doctrine of collateral estoppel, also known as issue preclusion, prevents the re-litigation of an issue actually litigated and adjudicated on the merits between the same parties or their privies." (Citation and punctuation omitted.) *York v. RES-GA LJY, LLC*, 300 Ga. 869, 877 (3) (799 SE2d 235) (2017). Although the bankruptcy court declined to compel Premier to turn over the credit card receipts in response to Sure's motion for such relief, that ruling was not an adjudication of the merits of the claim. Rather, the bankruptcy court determined that Sure was required to pursue that claim in an adversary proceeding, and, indeed, Rule 7001 (1) of the Federal Rules of Bankruptcy Procedure provides that an adversary proceeding includes "a proceeding to recover money or property[.]" Therefore, the bankruptcy court's order reflects only the court's determination that the issue of the credit card receipts could not be resolved by motion but instead required a separate adversary proceeding. *Dzikowski v. Boomer's Sport's & Recreation Ctr., Inc. (In re Boca Arena, Inc.)*, 184 F3d 1285,

14

1286 (11th Cir. 1999) ("In bankruptcy, adversary proceedings generally are viewed as 'stand-alone lawsuits[.]'"). See also *Anthony v. Ocwen Loan Servicing, LLC (In re Anthony)*, 550 BR 577, 580 (M.D. Fla. 2016) (The bankruptcy rules give "an adversary proceeding all the trappings of traditional civil litigation.") (citation and punctuation omitted).

Nothing in the record before us indicates that an adversary proceeding was ever initiated, much less completed, in conjunction with the Second Bankruptcy Action, and the record contains no other evidence showing that Sure's claim for credit card receipts has ever been adjudicated on the merits. Therefore, the doctrine of collateral estoppel does not apply to bar Sure from pursuing that claim in this litigation.

2. *Wrongful foreclosure* – Sure asserts that the trial court erred in granting the motion for summary judgment as to its wrongful foreclosure claim because genuine issues of material fact exist on the issue of whether Premier paid a grossly inadequate price for the Adjacent Property at the Foreclosure sale. The trial court granted summary judgment on Sure's claim for wrongful foreclosure on a number of grounds, including that Sure failed to tender the amount due as required to obtain equitable relief on its claim for wrongful foreclosure.

Under Georgia law, "[h]e who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action." OCGA § 23-1-10. And "[u]nder application of this maxim [to a wrongful foreclosure action], before the complainant would be entitled to equitable relief, she must do equity and tender the amount due under the security deed and note." *Berry v. Govt. Nat. Mtg. Assn.*, 231 Ga. 503, 503 (202 SE2d 450) (1973). Generally, where a plaintiff fails to make such tender, it is not entitled to set aside the foreclosure sale. See *Smith v. Citizens & Southern Financial Corp.*, 245 Ga. 850, 852 (1) (268 SE2d 157) (1980); *Stewart v. Suntrust Mtge, Inc.*, 331 Ga. App. 635, 640-41 (770 SE2d 892) (2015). Here, it is undisputed that Sure accepted and failed to repay at least $6,000 of the Loan proceeds, yet it failed to tender any amount in connection with its claim of wrongful foreclosure. Therefore, Sure is not entitled to the equitable relief it seeks to set aside the Foreclosure sale.

Nevertheless, Sure argues on appeal that it should be exempted from the tender requirement because Premier's improper conduct in withholding Sure's credit card receipts, inter alia, caused Sure's default on the Loan resulting in the Foreclosure, citing *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Community Trust*, 298 Ga. 221, 236 (4) (a) (780 SE2d 311) (2015) ("[T]ender is not an absolute rule,

16

especially where it is alleged that the foreclosing party procured the sale of the property through its own improper conduct[.]") (citation omitted). However, Sure did not raise this argument in the trial court below , and "[i]t is well settled that appellate courts will not consider new arguments in opposition to a motion for summary judgment raised for the first time on appeal." (Citations and punctuation omitted.) *Humphrey v. JP Morgan Chase Bank, N.A.*, 337 Ga. App. 331, 333 (1) (a) (787 SE2d 303) (2016) (declining to consider new argument on wrongful foreclosure claim).

> Each party has a duty to present his best case on a motion for summary judgment. [Our Supreme] Court has specifically held that, in responding to a motion for summary judgment, plaintiffs have a statutory duty "to produce whatever viable theory of recovery they might have or run the risk of an adjudication on the merits of their case."

(Citation omitted.) *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828 (2) (573 SE2d 389) (2002).

Accordingly, we find the trial court properly granted summary judgment on Sure's wrongful foreclosure claim on the ground that Sure failed to tender the amounts it owed under the terms of the Note and the Deed to Secure Debt. Therefore, we need not address the parties' arguments regarding the other grounds cited by the trial court in support of this ruling.

17

3. *Fraud* – Sure also asserts that the trial court erred in granting summary judgment on its fraud claim. Although Sure raises a number of arguments on appeal in support of this assertion, the only argument it raised below was its contention that at the time Premier made the Loan, it had no present intent to furnish Sure the full $56,000 to make renovations to the Station. Rather, its intent was to force Sure into default in order to obtain the Adjacent Property through foreclosure. Accordingly, this is the only argument we may consider on appeal. *Pfeiffer*, 275 Ga. at 828 (2).

In order to establish a claim for fraud, Sure must prove:

a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to plaintiff. For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort.

(Citation omitted.) *Roberts v. Nessim*, 297 Ga. App. 278, 284 (1) (676 SE2d 734) (2009). "Fraud may be proved by slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question." (Citations and punctuation omitted.) *JTH Tax, Inc. v. Flowers*, 302 Ga. App. 719, 726 (2) (691 SE2d 637) (2010). Nevertheless, a claim of fraud generally "cannot be predicated on a promise contained in a contract because fraud generally cannot be

18

predicated on statements that are in the nature of promises as to future events, and to hold otherwise, any breach of a contract would amount to fraud." Id. at 725 (2). "However, an exception to this rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place." Id. "Fraudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith. [Cits.]" *BTL COM Ltd. v. Vachon*, 278 Ga. App. 256, 261 (1) (628 SE2d 690) (2006).

Sure asserts that Premier signed the Loan documents with no present intent to actually loan it the $56,000 referenced in the promissory note as part of its plan to induce Sure to put up as collateral the Adjacent Property, which Nwokolo asserts is worth far more than $56,000. Nwokolo testified in his deposition that the fair market value of the Adjacent Property was $1.5 million based on recent sales of similarly undeveloped properties in the area.[3] Sure contended that Premier worked to insure its

---

[3] Under Georgia law, "[a] witness need not be an expert or dealer in an article or property to testify as to its value if he or she has had an opportunity to form a reasoned opinion." OCGA § 24-7-701 (b). This provision "crystallizes principles of prior Georgia law relating to value of property." Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 369 (5th ed. 2016). Under prior law, an owner of

19

default on the Loan by failing to give it the full Loan proceeds and instead forwarding $14,000 to B&B without its consent. Nwokolo testified that he never signed the Authorization for this payment and that, in fact, his signature on that document is forged. Sure argues that these post-contract actions would allow a jury to infer that Premier had fraudulent intent at the time the Loan documents were signed.

We find that this evidence is sufficient to create genuine issues of material fact on its fraud claim, including whether Premier ever intended to loan Sure the amount agreed, whether Nwokolo authorized the payment of money to B&B, and whether it forged his signature on the Authorization. Accordingly, the trial court erred in granting Premier's motion for summary judgment as to this allegation of fraud. See generally *Vachon*, 278 Ga. App. at 261 (1); *Ades v. Werther*, 256 Ga. App. 8, 11 (2)

---

property must give the facts upon which he bases his opinion of value, and "[a] showing that the witness had some knowledge, experience, or familiarity as to the value of the item is the requisite foundation." *Dickens v. Calhoun First Nat. Bank*, 214 Ga. App. 490, 491 (2) (448 SE2d 237) (1994). A determination of whether the proper foundation has been laid is within the trial court's discretion. *Dept. of Transp. v. Into*, 219 Ga. App. 311, 311 (1) (464 SE2d 886) (1995). Because the trial court in this case has not ruled that Nwokolo's valuation testimony is incompetent, we will consider it for purposes of summary judgment. *Dalton v. City of Marietta*, 280 Ga. App. 202, 204 (1) (633 SE2d 552) (2006) (On summary judgment, a court "may consider *any material which would be admissible or usable at trial*.") (citation and punctuation omitted; emphasis in original).

20

(a) (567 SE2d 340) (2002). However, to the extent that Sure raises arguments regarding other alleged misrepresentations and fraudulent actions on appeal, we must affirm the trial court's grant of summary judgment as to any such claims because Sure failed to raise these arguments below. *Pfeiffer*, 275 Ga. at 828 (2).

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Mercier, J., concur.*